DAN ROBERT NEWBURN, APPELLANT, v. HOWARD HUGHES MEDICAL INSTITUTE, RESPONDENT.

No. 11231

May 16, 1979                                              594 P.2d 1146

[Rehearing denied July 11, 1979]

*Beckley, Singleton, DeLanoy & Jemison, Chartered,* and *Denton and Denton,* of Las Vegas, for Appellant.

*Fahrenkopf, Mortimer, Sourwine, Mousel & Pinkerton,* of Reno, and *Hogan & Hartson,* of Washington, D.C., for Respondent.

## OPINION

By the Court, THOMPSON, J.:

Dan Robert Newburn, a reporter for the Las Vegas Sun, appeals from a judgment of the district court finding him in contempt of court. The court had ordered him to appear for deposition to answer all questions relating to matters which he had disclosed during an interview on April 6, 1978, with Richard Gano, Robert Herring, and Martin Cook, including (a) facts concerning his conversations with Terry Moore, Linda Hollings and Richard Gray regarding Howard R. Hughes, Jr., his will, his testamentary intent, and related matters, and (b) facts concerning documents relating to Howard R. Hughes, Jr., which Newburn observed or took possession of in his meetings with Terry Moore, Linda Hollings and Richard Gray. Newburn also had been ordered to produce all documents in his possession, custody or control described in a subpoena served upon him which documents had been delivered to him by Linda Hollings.

Howard Hughes Medical Institute (HHMI) is a nonprofit corporation established by Howard R. Hughes, Jr., in 1953 and actively engaged in medical research. It is the plaintiff in an action wherein it is alleged that it is the beneficiary of the Last Will and Testament of Hughes and requests an opportunity to discover such will or to prove the contents thereof if it cannot be found.

In March 1978 Newburn approached Judge Hayes, who had been handling certain matters pertaining to the Hughes Estate, and requested his advice regarding materials he, Newburn, had observed suggesting the existence of a valid Hughes will. The

Judge recommended that he contact representatives of the Hughes Estate. He met with those representatives on April 6, 1978, to answer questions with respect to his knowledge of the Hughes will. Present were Richard Gano, the California special administrator of the Estate of Howard R. Hughes, Jr., Robert Herring, an attorney for persons asserting claims as intestate heirs of Hughes, Martin Cook, counsel for HHMI, and Newburn. The interview was tape recorded with the consent of all present.

Newburn revealed conversations he had engaged in with Richard Gray, an attorney who had represented Hughes during the 1950–60's, with Linda Hollings, the widow of Richard Gray, and with Terry Moore. His conversations with Gray were about discussions between Gray and Hughes concerning Hughes' testamentary intent. He disclosed that Linda Hollings had delivered to him memos between Hughes and Gray which may have pertained to matters that might be included in a will.

Newburn also discussed documents he had witnessed at the home of Terry Moore. One of those documents appeared to be a will. Regarding that document, Newburn described the contents of several provisions, the number of pages, the color of the backing to which it was affixed, and stated that it had been signed in ink, apparently by Hughes, and witnessed by Frank Lloyd Wright, Vern or Vernon Mason, and Nadine Henley. This document left the bulk of the Hughes Estate to HHMI.

When Newburn appeared for deposition to give sworn testimony regarding matters disclosed during the interview of April 6, 1978, he declined to answer any questions claiming the news media privilege contained in NRS 49.275. Thereafter, HHMI moved for an order compelling discovery which the court granted. Newburn, however, persisted in his refusal to answer questions or produce documents, and was, therefore, adjudged in contempt of court.

Since the entry of the contempt judgment Newburn has agreed to answer questions regarding conversations between himself and Dick Gray. Therefore, we are not concerned with that area of discovery. Moreover, the documents delivered to Newburn by Linda Hollings apparently are not in his possession or control. In such circumstances one may not be held in contempt for the failure to produce such documents. McPhaul v. United States, 364 U.S. 372 (1960). Consequently, this opinion concerns only the discovery of his conversations with Terry Moore and the story of his observations of documents while in her home.

1. Absent a statute, communications to a news reporter do not enjoy a privilege against use as evidence, and the reporter may be compelled to reveal information given to him in his professional capacity. Brewster v. Boston Herald-Traveler Corporation, 20 F.R.D.416 (D. Mass. 1957); Clein v. State, 52 So.2d 117 (Fla. 1950); In Re Goodfader's Appeal, 367 P.2d 472 (Hawaii 1961); People v. Sheriff of New York County, 199 N.E. 415 (N.Y. 1936). Sound policy requires the full disclosure of information in order that justice may prevail. The public interest in the administration of justice is deemed superior to any private considerations that may exist between a reporter and his informant.

Consequently, if the legislature has not enacted a shield law the tendency of the courts is not to extend the classes to whom the privilege from disclosure is granted, but to restrict that privilege. People v. Sheriff of New York County, supra.

Of course, the Nevada Legislature has created a privilege from disclosure for a news reporter. It is embodied in NRS Chapter 49 along with other recognized privileges. The general statutory scheme is that no person has a privilege to refuse to be a witness, disclose any matter or produce any object or writing unless granted a privilege to do so [NRS 49.015], which privilege may be waived by voluntary disclosure [NRS 49.385].

2. In the matter at hand the district court ruled that there was no basis upon which to construe Newburn's April 6, 1978, disclosures as investigative reporting since he was not receiving information, but, rather, was voluntarily disclosing information. Accordingly, that court found that any claim of privilege was waived.

Newburn challenges that finding. It is his contention that the privilege created by NRS 49.275 is absolute and not subject to waiver within the intendment of NRS 49.385.[1] We summarily reject this contention. All privileges recognized by NRS Chapter 49 are explicitly subject to the waiver provisions of NRS 49.385.

---

[1] NRS 49.275: "No reporter . . . of any newspaper, . . . may be required to disclose any published or unpublished information obtained or prepared by such person in such person's professional capacity in gathering, receiving or processing information for communication to the public, or the source of any information procured or obtained by such person, in any legal proceedings, trial or investigation: . . . ."

NRS 49.385: "1. A person upon whom these rules confer a privilege against disclosure of a confidential matter waives the privilege if he . . . voluntarily discloses or consents to disclosure of any significant part of the matter.

"2. This section does not apply if the disclosure is itself a privileged communication."

Subordinately, the appellant asserts that his voluntary disclosure of information on April 6 was itself a privileged communication within NRS 49.385(2) since he was engaged in "investigative reporting" the purpose of which was to seek information and to verify information he possessed regarding Mr. Hughes. The record fully supports the finding of the district court to the contrary.

The privilege against disclosure of a confidential matter is waived by a voluntary disclosure of any significant part. NRS 49.385(1). If the information disclosed by Newburn during the April 6 interview was not of a confidential character, he has no privilege to assert. On the other hand, if it was of a confidential character, it is evident that he did not consider it to have been received by him in confidence since he voluntarily disclosed that information and must be deemed to have waived any privilege conferred. In Re Dan, 363 N.Y.S.2d 493 (Sup.Ct. 1975).

Affirmed.

BATJER, J., concurs.

MANOUKIAN, J., concurring:

I agree with the majority's holding respecting the issue of waiver. Absent the plenary waiver, the court would have been more sensitive in addressing the scope of the news reporter's privilege.

In view of Newburn's voluntary disclosures, we need not involve ourselves in the balancing of the newsman's First Amendment rights against societal interests. See Application of Caldwell, 311 F.Supp. 358 (D.C.N.D. Cal. 1970); see also Silkwood v. Kerr-McGee Corp., 563 F.2d 433 (10th Cir. 1977).

MOWBRAY, C. J., dissenting:

Respectfully, I dissent.

Nevada has a strong shield law. NRS 49.275 provides:

> No reporter, former reporter or editorial employee of any newspaper, periodical or press association or employee of any radio or television station may be required to disclose any published or unpublished information obtained or prepared by such person in such person's professional capacity in gathering, receiving or processing information for communication to the public, or the source of any information procured or obtained by such person, in any legal proceedings, trial or investigation:
>
> 1. Before any court, grand jury, coroner's inquest, jury or any officer thereof.

2.  Before the legislature or any committee thereof.
3.  Before any department, agency or commission of the state.
4.  Before any local governing body or committee thereof, or any officer of a local government.

It is true that one who enjoys a news reporter privilege may waive it by voluntarily disclosing any significant part of the matter. The waiver does not apply if the disclosure is a privileged communication.[1]

In the case at hand, Newburn voluntarily disclosed conversations he had with Terry Moore in her home and his observation of certain documents located therein. The effect of our order today requires Newburn to testify under oath not only to those aforementioned matters but to all other matters "relating thereto". This, I believe, goes too far and is in contravention of the shield law. The courts must, in such cases, be cautious and enter only those orders that are firmly predicated upon a strict interpretation of the shield law. The reasons are obvious. As Mr. Justice Douglas said in Branzburg v. Hayes, 408 U.S. 665 (1972) at 721:

> Fear of exposure will cause dissidents to communicate less openly to trusted reporters. And, fear of accountability will cause editors and critics to write with more restrained pens.
>
> I see no way of making mandatory the disclosure of a reporter's confidential source of the information on which he bases his news story.
>
> The press has a preferred position in our constitutional scheme, not to enable it to make money, not to set newsmen apart as a favored class, but to bring fulfillment to the public's right to know. The right to know is crucial to the governing powers of the people, to paraphrase Alexander Meiklejohn. Knowledge is essential to informed decisions.
>
> As Mr. Justice Black said in New York Times Co. v. United States, 403 U.S. 713, 717 (concurring opinion), "The press was to serve the governed, not the governors. . . . The press was protected so that it could bare the secrets of government and inform the people."

---

[1]NRS 49.385:

"1.  A person upon whom these rules confer a privilege against disclosure of a confidential matter waives the privilege if he or his predecessor while holder of the privilege voluntarily discloses or consents to disclosure of any significant part of the matter.

"2.  This section does not apply if the disclosure is itself a privileged communication."

GUNDERSON, J., dissenting:

From the majority opinion as written, I respectfully dissent.

The majority do not confine respondent to interrogating appellant Newburn on the precise matters he heretofore disclosed. I could accept a ruling thus limited, on the premise that Newburn, by his own conduct, demonstrated he did not consider the disclosed information confidential. I cannot, however, agree that Newburn may properly be ordered to answer "all questions *relating* to matters which he had disclosed. . . ." (Emphasis added.)

The majority opinion may be read to destroy the shield law totally, through a mechanical application of NRS 49.385(1). In my view, merely because a newsman reveals a "significant part" of a conversation does not, either logically or legally, establish that he has revealed "a significant part of a confidential matter" he learned during that conversation. Such is the test by which NRS 49.385(1) requires waiver to be measured.

Sometimes, within a lengthy conversation, there may be only one item which the newsperson and the source consider "a confidential matter." Commonly, this is the source's name; however, it could also be the identity of some other source, or the whereabouts of other evidence. Obviously, such secrets "relate" to the rest of the conversation. Still, neither party anticipates a waiver, and NRS 49.385(1) raises none, when the newsman discloses portions of the parties' discussion which were not intended to remain secret.

In my view, under a correct interpretation of our statutes, one claiming a waiver of the shield law must prove, not merely that a "significant part" of a conversation has been disclosed, but that there has been disclosure of some part of the conversation which the parties intended to treat as "confidential." In my view, therefore, the majority opinion incorrectly implies that whenever news personnel relate something they have discovered, in or out of print, a waiver results, thereby subjecting such personnel to interrogation upon "related" matters. I am confident our Legislature never intended such a result.