LAS VEGAS SUN, INC.; HERMAN MILTON GREEN-SPUN; AND BRIAN LEE GREENSPUN, PETITIONERS, v. THE EIGHTH JUDICIAL DISTRICT COURT, IN AND FOR THE COUNTY OF CLARK, STATE OF NEVADA; AND THE HONORABLE JOSEPH S. PAVLIKOWSKI, DISTRICT JUDGE, RESPONDENTS, MILTON I. SCHWARTZ, CHECKER CAB COMPANY OF NEVADA, INC., AND YELLOW CAB COMPANY OF NEVADA, INC., NEVADA CORPORATIONS, REAL PARTIES IN INTEREST.

No. 17930

September 29, 1988 · · · · · · · · · · · · · · · · · 761 P.2d 849

*Beckley, Singleton, DeLanoy, Jemison & List, Frances Forsman, Daniel F. Polsenberg,* Las Vegas; *Rudin, Richman & Appel* and *Vincent Chieffo,* Beverly Hills, California, for Petitioners.

*Gang & Berkley,* Las Vegas; *Lubell & Lubell* and *Mary K. O'Melveny,* New York, New York, for Real Parties in Interest.

*Hale, Lane, Peek, Dennison & Howard* and *Gregg W. Zive,* Reno, for Amicus Curiae.

## OPINION

By the Court, SPRINGER, J.:

Petitioners request a writ of prohibition, asserting that the district court has exceeded its jurisdiction by entering a discovery order against them which contravened the provisions of NRS 49.275.[1] The writ will be granted, subject to instructions.

The discovery order was entered during the course of a libel suit brought by Milton Schwartz against the petitioners herein, Herman and Brian Greenspun and the *Las Vegas Sun*. Schwartz claims that he and two companies which he partly owns (the real parties in interest in this case) were defamed by a series of editorials written by the Greenspuns and published in the *Las Vegas Sun*. As part of his pretrial preparation, Schwartz attempted to discover a wide range of materials relating to the editorials, which he believed were in the possession of petitioners. Herman Greenspun answered Schwartz's requests by citing the Nevada news shield law, NRS 49.275, claiming that statute granted him an absolute privilege not to disclose any information.

Schwartz turned to the district court for relief. The court entered an order which allowed discovery of materials relating or pertaining to any persons, organizations or documents specifically named in the editorials. Petitioners assert that this order abrogates their statutory news shield privilege, and they seek a writ of prohibition to assure their privilege.

We conclude that the discovery order is too broad and intrudes upon the statutory privilege granted by the legislature. The possible harm resulting from the order cannot be undone on appeal; therefore, we are disposed to grant the extraordinary relief of a writ. Schlatter v. District Court, 93 Nev. 189, 561 P.2d 1342 (1977).

---

[1] NRS 49.275 states:

No reporter, former reporter or editorial employee of any newspaper, periodical or press association or employee of any radio or television station may be required to disclose any published or unpublished information obtained or prepared by such person in such person's professional capacity in gathering, receiving or processing information procured or obtained by such person, in any legal proceedings, trial or investigation:

1. Before any court, grand jury, coroner's inquest, jury or any officer thereof.

2. Before the legislature or any committee thereof.

3. Before any department, agency or commission of the state.

4. Before any local governing body or committee thereof, or any officer of a local government.

To resolve this case, we must interpret and apply the Nevada news shield statute, NRS 49.275. Statutes should be interpreted so as to effect the intent of the legislature in enacting them; the interpretation should be reasonable and avoid absurd results. Cragun v. Nevada Pub. Employees' Ret. Bd., 92 Nev. 202, 547 P.2d 1356 (1976); Welfare Div. v. Washoe Co. Welfare Dep't, 88 Nev. 635, 503 P.2d 457 (1972).

The legislative history behind the current shield law illustrates the legislators' concern with protecting confidentiality during and after the news gathering process. The legislature enacted the first shield law in 1969. It protected news media representatives from forced disclosure of their sources. Members of the press argued that confidential sources had to be protected from exposure to insure the free flow of information, particularly information about government corruption or mismanagement. The public, they claimed, had a right to know about such occurrences, but if sources were afraid to talk to reporters, the public's access to this valuable information would be severely restricted. Supporters of the legislation argued that if reporters could promise sources that their identities would not be revealed, sources would be more likely to give reporters information, and this would benefit the public. *See* Senate Jud. Comm. Minutes, S.B. 299, March 4, 1969 and March 27, 1969.

The shield law was extended in 1975[2] to provide protection for former newsmen and for unpublished information. Several states expanded their shield statutes in a similar fashion, because some courts had applied the shield privilege exclusively to published information. *See, e.g.,* Cal. Evid. Code § 1070 (West Supp. 1988) (revised in 1974 to include unpublished information); Tofani v. State, 465 A.2d 413 (Md. 1983) (notes revision of Maryland law in 1979 to include unpublished information). Assemblyman Coulter told the Senate Judiciary Committee that the bill would extend protection to a newsman's "tools," i.e., notes, tape recordings and photographs. The underlying rationale was the same as in 1969: serve the public interest by protecting

---

[2]The news shield privilege became part of Chapter 49, Privileges, when the new Evidence Code was adopted. 1971 Statutes of Nevada 787. The waiver statute, NRS 49.385, was adopted from Federal Rule 5-11 and inserted at the end of the chapter. We conclude the legislature meant the waiver statute to apply to all of the privileges included in Chapter 49, although on its face it appears to refer only to "confidential" matters. *See* note 4, *infra.* Several of the privileges in Chapter 49 do not specifically refer to confidentiality, but we are confident that the irregularity is due to the mixture of language from different sources, and not the intent of the legislature to apply waiver only to the privileges which rest on confidentiality.

reporters in their news gathering efforts. *See* Senate Jud. Comm. Minutes, A.B. 381, May 1, 1975.

.None of the witnesses at either set of hearings asked for a change in the law concerning defamation, libel or slander. None of the legislators expressed any intention to protect news media organizations from libel suits. In fact, the press assured the legislators that the newsman's shield would have no effect on the law of libel.[3] Nevertheless, we are now faced with a conflict between the plaintiff's need to produce evidence and the media defendant's right to avoid disclosure of its sources and other information in its possession. We recognize that the best evidence of libel is often in the possession of the defendant, but the news shield statute prevents the plaintiff from fully exploring this readily available source.

We addressed this conflict in Newburn v. Howard Hughes Medical Institute, 95 Nev. 368, 594 P.2d 1146 (1979). Newburn, a reporter, had voluntarily disclosed some of the information he had concerning a purported will made by Howard Hughes in a conference with representatives of the Hughes estate. He then refused to answer any questions regarding the will at a deposition, relying on NRS 49.275. Our opinion in *Newburn* held that the waiver statute, NRS 49.385,[4] applied to all of the privileges in Chapter 49, including the shield law. We did not, however, fully delineate the scope of that waiver. The majority opinion allowed discovery of all of the information Newburn had relating to the subject of his voluntary disclosure, but two dissents objected to the scope of that ruling, arguing it was too broad and contravened the underlying purpose of the shield law. 95 Nev. at 372, 594 P.2d at 1149 (MOWBRAY, J.); *id.* at 374, 594 P.2d at 1150 (GUNDERSON, J.).

---

[3]Confidentiality of news sources and background information do not change the laws of libel one whit. . . . A newspaper is responsible for what it prints, whether it names its sources or not. Truth and/or malice are still the determinants of libel, not shield laws.

Statement of Warren Lerude, Senate Jud. Comm. Minutes, A.B. 381, May 1, 1975. This point of view was also articulated by Petitioner Greenspun in one of his editorials:

There is nothing magic about a newspaper because it is subject to all the remedies the law grants to people who are unfairly accused, slandered, libeled or maliciously harassed.

"Where I Stand," *Las Vegas Sun,* January 10, 1985, at 2A, col. 4.

[4]NRS 49.385 states:

1. A person upon whom these rules confer a privilege against disclosure of a confidential matter waives the privilege if he or his predecessor while holder of the privilege voluntarily discloses or consents to disclosure of any significant part of the matter.
2. This section does not apply if the disclosure is itself a privileged communication.

Today we again hold that a waiver under NRS 49.385 applies to the news gatherers' privilege and describe more definite limitations on the breadth of waiver in matters relating to discovery of information held by news media defendants. First, we note that a privilege may be waived even in the absence of a waiver statute. *Tofani, supra,* 465 A.2d at 417. Second, we conclude that the disclosure of a source and the attribution of remarks to that source is a clear cut waiver of the shield privilege as to that name and those statements. When a newspaper or broadcaster names its source and quotes statements made by that source, the underlying purpose of the shield law is vitiated and the statutory privilege is waived. Lexington Herald-Leader Co. v. Beard, 690 S.W.2d 374 (Ky. 1984); In re Bridge, 295 A.2d 3 (N.J. 1972), *cert. den.* 410 U.S. 991 (1973). There is no claim of confidentiality to be made under these circumstances, as conceded by petitioners at the appeal hearing.[5] Therefore, during the discovery process, news media litigants can properly be required to admit and document the precise matters disclosed in their publications or broadcasts.

The law plainly prohibits additional discovery. The statute protects not only sources, but information. Plaintiffs are not entitled to the complete notes taken at an interview, even when the source and part of the interview have been disclosed. Plaintiffs are not entitled to background information or to "outtakes" of television broadcasts. *See* Hammarley v. Superior Court, 89 Cal.App.3d 388 (1979). The legislative intent to protect the confidentiality of the materials and sources necessary to carry on the news gathering process in a manner which best serves the public is clear from the relevant history and the statute itself.

Before concluding, it should be noted that our ruling today will not allow a media defendant totally to avoid accountability for defamatory utterances through manipulative use of the shield law. The shield law creates a protective environment for the reporter who is engaged in obtaining, preparing and collecting information. It does not create a special privilege for news media litigants, however.

---

[5]At oral argument of this case, petitioners' counsel explicitly acknowledged in this regard: "That's not the position that we are taking today." Counsel categorically disavowed any intent to assert that a reporter has a right to identify and quote a certain source in a news story, and thereafter to refuse discovery as to whether or not the story was true in such particulars. Counsel stated: "I do not make that claim, your Honor. What I am saying is that the fact that you quoted that person does not then waive the rest of the material as to all other documents."

There are no data suggesting that the legislature intended to allow the news media to commit libel, free from responsibility, or to disrupt the carefully balanced structure of civil procedure.[6] *See* Holloway v. Barrett, 87 Nev. 385, 487 P.2d 501 (1971). Thus, we conclude that certain restrictions are necessary to prevent news media litigants from abusing the shield law. When a plaintiff attempts to discover the basis of a news story which is felt to defame him or her, and the news media defendant relies on the shield law to resist discovery, the defendant will be deemed to have thereby elected to protect the confidentiality of that information. Once the defendant has made such an election, confidentiality may not thereafter be waived whenever it may suit the defendant's convenience; and the defendant may not thereafter rely on it for a defense at trial. In our opinion, this position is a suitable and necessary compromise between the needs of the plaintiff, the orderly conduct of a trial, and the statutory privileges of news media representatives. *See* Dowd v. Calabrese, 577 F.Supp. 238, 244 (U.S.D.C. 1983); Mazella v. Philadelphia Newspapers, Inc., 479 F.Supp. 523, 529 n.3 (E.D.N.Y. 1979) Greenberg v. CBS Inc., 419 N.Y.S.2d 988, 997 (1978).

We are convinced that the legislature did not intend to allow the use of the news shield law as a sword in libel suits. We see no reason why a news media defendant should be able to rely on the privilege until the day of trial, then renounce the privilege and use previously undisclosed information as a defense against the plaintiff's evidence of negligence, reckless disregard of the truth, or actual malice. Such a dual, selectively self-serving use of the shield privilege would result in excessive prejudice to the plaintiff and waste judicial resources. The code of civil procedure was adopted in part to streamline the discovery process and prevent surprise at trial. There is no evidence that the legislature enacted the shield law as a circumvention of normal court procedure; therefore, if attempted, our courts could not allow such disruption.

Finally, in passing, we note there is a serious question in this case about the manner in which the privilege has been claimed. The privilege was asserted by Herman Greenspun alone, by a mere recitation of NRS 49.275. This response is not adequate to claim the privilege, which is personal to the ''reporter, former

---

[6]The procedures of court are within our jurisdiction, not the legislature's. We are not prepared, however, to go as far as our sister court in New Mexico and declare the shield statute invalid for that reason. Ammerman v. Hubbard Broadcasting, 551 P.2d 1354 (N.M. 1976), *cert. den.* 436 U.S. 906 (1978).

reporter, or editorial employee''[7] who obtained or prepared the requested information in his or her professional capacity in the process of gathering news. Apparently neither Greenspun nor anyone else swore to the facts supporting the claim of privilege in affidavits presented to the district court. Absent compliance with the statutory requisites, no privilege of nondisclosure ought to be recognized. Any further claims should be supported by sworn affidavits, identifying the news gatherer and attesting that the information was obtained or produced during the news gathering process in that person's professional capacity.

The writ of prohibition will be issued, and notice in lieu of remittitur shall issue forthwith. The district court shall control further discovery in accordance with this opinion. Because the implications of invoking the protections of the shield law have not previously been articulated by this Court, the petitioners shall be permitted to re-evaluate the manner in which they asserted their claim of the shield law privilege.

GUNDERSON, C. J., and STEFFEN, YOUNG, and MOWBRAY, JJ., concur.

---

[7]We are satisfied that the legislature meant to include newspaper publishers in its definition of "editorial employees." *See* Senate Jud. Comm. Minutes, A.B. 381, March 7, 1969.