OPINION
By the Court,
Leavitt, L:
This original petition for a writ of mandamus or prohibition challenges an order of the district court that denied petitioners’ motion to compel the real party in interest to answer deposition questions. The real party in interest, a news reporter, invoked the protection of Nevada’s news shield statute against compelled disclosure of information he obtained while investigating a fatal traffic accident. As we conclude that the news shield statute affords *91 reporters a privilege from compelled disclosure of the contents of a published article, we conclude that extraordinary relief is not warranted; consequently, we deny the petition.

FACTS

On September 21, 1996, at approximately 1:00 a.m., Nevada Highway Patrol (“NHP”) trooper John Kennedy responded to a dispatch stating that a person was lying in a northbound lane of Interstate 95 at the Summerlin Parkway off-ramp in Las Vegas. Upon arriving at the scene, Trooper Kennedy approached the person, who was identified as Michael Estrada. The record before this court is unclear as to what transpired next. Trooper Kennedy testified during his deposition that he detected the odor of alcohol on Estrada’s breath and that Estrada admitted that he had been drinking. The record also reveals from the NHP dispatch transcript that, as Trooper Kennedy was en route to the scene, the NHP dispatcher informed the Las Vegas Metropolitan Police that there was no need for their involvement; the dispatcher stated, “[W]e’re there and it’s just a broken down vehicle.” Trooper Kennedy later informed the NHP dispatcher that Estrada was the registered owner of the vehicle but that Estrada claimed he had been riding as a passenger in the vehicle. According to the transcript, Trooper Kennedy explained to the dispatcher that “[t]he reason the vehicle is . . . being towed is it stalled in the travel lane and as soon as we get clear here I’ll be [transporting Estrada] to his . . . residence.” Trooper Kennedy arranged for Estrada’s vehicle, which was parked on the shoulder of the road, to be towed and then drove Estrada home.
Later that day, at approximately 12:30 p.m., Estrada, his wife, daughter, and stepson retrieved Estrada’s vehicle from the towing company. Estrada drove away in the vehicle, with his stepson as a passenger, while his wife and daughter followed in another vehicle. Shortly thereafter, Estrada and his stepson were involved in a collision with another vehicle. Estrada, his stepson, and all three people in the other vehicle were killed. Petitioners, who are relatives of the five victims of the fatal accident, assert that Estrada was intoxicated at the time of the accident.[1] Following the accident, petitioners filed a wrongful death action against the state, the NHP, and the towing company.
During discovery, petitioners deposed Trooper Harney, an NHP public information officer, who had been quoted in articles about the accident that appeared in the Las Vegas Review-Journal. *92 Specifically, the articles, which were authored by real party in interest Glenn Puit, credit Harney with stating, among other things, that “troopers” questioned Estrada “hours before the fatal pileup for suspicion of drunk driving.” Additionally, Trooper Harney is reported as stating that “troopers could not charge Estrada with drunken driving because Estrada did not have the keys [to the vehicle] in his possession and there were no witnesses who could say he was behind the wheel.” At his deposition, Trooper Harney testified that to the best of his recollection, what he told Puit about the encounter was that the NHP “responded to an abandoned vehicle alongside the roadway; and that there was a gentleman there that was sitting off the roadway; and that we had asked him if he . . . was driving the vehicle; and he stated that a friend was and had left; and . . . that there was no . . . witness to place him behind the wheel of the automobile; and based on that we did not arrest him.’ ’ Furthermore, during his deposition, Trooper Harney claimed that he could not remember whether he had made certain statements attributed to him in the articles, so he deferred to the articles.
Petitioners later attempted to depose, in an apparent effort to impeach Trooper Kennedy and other law enforcement officers who had given statements inconsistent with those attributed to Trooper Harney in the Review-Journal articles. At his deposition, Puit refused to answer questions by citing the reporter’s privilege as conferred by NRS 49.275, Nevada’s news shield statute.
Subsequently, petitioners filed a motion to compel Puit to answer the questions. Puit, who was joined by the NHP, opposed the motion. The discovery commissioner concluded that both Nevada’s news shield statute and the First Amendment-based reporter’s privilege required that petitioners’ motion to compel be denied. The district court adopted the discovery commissioner’s report and recommendations, despite petitioners’ objections.
Petitioners then filed a motion for reconsideration, which the district court granted. Although the district court found the information sought by petitioners to be probative and relevant as impeachment evidence, it determined that Puit could not be compelled to testify pursuant to Nevada’s news shield statute. Accordingly, the district court reaffirmed the discovery commissioner’s report and recommendations.
Petitioners subsequently filed this original petition for writ of mandamus or prohibition, to which Puit has filed an answer.[2]

*93
DISCUSSION

I. Extraordinary relief
A writ of mandamus may be issued to compel the performance of an act that the law requires as a duty resulting from an office, trust or station, or to control an arbitrary or capricious exercise of discretion. See State ex rel. Dep’t Transp. v. Thompson, 99 Nev. 358, 662 P.2d 1338 (1983); Round Hill Gen. Imp. Dist. v. Newman, 97 Nev. 601, 637 P.2d 534 (1981). A writ of prohibition, in turn, is the ‘ ‘proper remedy to restrain a district [court] from exercising a judicial function without or in excess of its jurisdiction.” Smith v. District Court, 107 Nev. 674, 677, 818 P.2d 849, 851 (1991). Either writ will only issue where “there is not a plain, speedy and adequate remedy in the ordinary course of law.” NRS 34.170; NRS 34.330.
Generally, extraordinary relief is unavailable to review discovery orders. See Hetter v. District Court, 110 Nev. 513, 515, 874 P.2d 762, 763 (1994). Thus, we could conclude that petitioners have a plain, speedy and adequate remedy at law that would preclude extraordinary relief, since petitioners may challenge the district court’s order in an appeal from an adverse final judgment. See Clark County Liquor v. Clark, 102 Nev. 654, 730 P.2d 443 (1986). Nevertheless, “where an important issue of law needs clarification and public policy is served by this court’s invocation of its original jurisdiction, . . . consideration of a petition for extraordinary relief may be justified.” Business Computer Rentals v. State Treas., 114 Nev. 63, 67, 953 P.2d 13, 15 (1998). One such instance is when a writ petition offers this court “a unique opportunity to define the precise parameters of [a] privilege” conferred by a statute that this court has never interpreted. Ashokan v. State, Dep’t of Ins., 109 Nev. 662, 667, 856 P.2d 244, 247 (1993). We conclude that this writ petition raises an issue of first impression that implicates a matter of public importance: Whether a journalist waives the protection of the news shield statute with respect to the contents of an article that has been published. Accordingly, today we address this petition.
II. Nevada’s news shield statute
Nevada’s news shield statute is one of the most liberal in the country. See Leslye deRoos Rood and Ann K. Grossman, The *94 Case for a Federal Journalist’s Testimonial Shield Statute, 18 Hastings Const. L.Q. 779 (1991) (comparing the protection provided by various state news shield statutes) [hereinafter Testimonial Shield Statute]. The statute confers upon journalists an absolute privilege from disclosure of their sources and information in any proceeding. Specifically, the shield statute provides in pertinent part:
No reporter ... of any newspaper . . . may be required to disclose any published or unpublished information obtained or prepared by such person in such person’s professional capacity in gathering, receiving or processing information for communication to the public, or the source of any information procured or obtained by such person, in any legal proceedings, trial or investigation:
1. Before any court, grand jury, coroner’s inquest, jury or any officer thereof.
NRS 49.275(1).
In 1971, two years after enacting the first shield law, which preceded NRS 49.275, Nevada’s legislature enacted NRS 49.385, which governs waiver of privileges by voluntary disclosure. The waiver statute provides:
1. A person upon whom these rules confer a privilege against disclosure of a confidential matter waives the privilege if he or his predecessor while holder of the privilege voluntarily discloses or consents to disclosure of any significant part of the matter.
2. This section does not apply if the disclosure is:
(a) Itself a privileged communication; or
(b) Made to an interpreter employed merely to facilitate communications.
NRS 49.385(1) and (2)(a) and (b).
Questions of statutory interpretation are subject to this court’s independent review. See State, Emp. Sec. Dep’t v. Holmes, 112 Nev. 275, 283, 914 P.2d 611, 616 (1996). “It is well settled in Nevada that words in a statute should be given their plain meaning unless this violates the spirit of the act.” McKay v. Bd. of Supervisors, 102 Nev. 644, 648, 730 P.2d 438, 441 (1986). “ ‘[N]o part of a statute should be rendered nugatory, nor any language turned to mere surplusage, if such consequences can properly be avoided.’ ’ ’ Paramount Ins. v. Rayson & Smitley, 86 Nev. 644, 649, 472 P.2d 530, 533 (1970) (alteration in original) (quoting Torreyson v. Board of Examiners, 7 Nev. 19, 22 (1871)). Thus, “[w]here a statute is clear on its face, a court may not go *95 beyond the language of the statute in determining the legislature’s intent.” McKay, 102 Nev. at 648, 730 P.2d at 441.
Petitioners contend that Puit waived the shield statute’s protection by “identifying his sources and quoting the sources directly in his articles.” Petitioners insist that no confidential information is being sought from Puit. Rather, petitioners are allegedly seeking to ascertain whether statements attributed to Trooper Harney in the published news articles were in fact made by him and whether the statements are accurate, since Trooper Harney testified that he cannot recall what he said and deferred to the Puit articles. Petitioners insist that several of the statements in the articles constitute admissions that are directly relevant to the issue of liability against the state and the NHP and that the statements also impeach testimony given by other law enforcement personnel.
Puit points out that Nevada’s news shield statute protects both published and unpublished information from disclosure. According to Puit, if publication constitutes waiver of the reporter’s privilege, then the word “published,” as found in NRS 49.275, would be rendered meaningless. Moreover, Puit maintains that even if the waiver statute could apply to the news shield statute, the “publication of information by a reporter to the public in the course of his professional activities is, itself, a privileged communication^]” and therefore, an exception to the waiver statute applies. Puit asserts that “[s]ince Nevada’s Shield Law applies to ‘published’ ‘information’ ‘prepared by’ a reporter, the law obviously applies to published newspaper articles.” The Nevada Press Association agrees with Puit’s position.[3] In its amicus curiae brief, it contends that had the legislature intended that the reporter’s privilege apply only to unpublished and confidential information, the legislature would have specifically excluded the word “published” from the statute.
This court has previously held that the news shield statute only applies to confidential information and can be waived by voluntary disclosure. Newburn v. Howard Hughes Medical Institute, 95 Nev. 368, 594 P.2d 1146 (1979); accord Las Vegas Sun v. District Court, 104 Nev. 508, 761 P.2d 849 (1988).
In Newburn, we considered whether the news shield statute is waived when a news reporter voluntarily discloses information. There, the news reporter, Newburn, met with representatives of Howard Hughes’ estate in April 1978, and answered questions with respect to information he had obtained concerning the exis *96 tence of Hughes’ will. Newburn, 95 Nev. at 370, 594 P.2d at 1147-48. Later, when Newburn appeared for a deposition regard-ing matters disclosed during the April 1978 meeting, he asserted the reporter’s privilege and declined to answer questions. Id., 594 P.2d at 1148. The party taking Newburn’s deposition moved for an order to compel discovery. Id. In granting the motion, the district court found that Newburn had waived any claim of privilege by voluntarily disclosing the information at the April 1978 meeting. Id. at 371, 594 P.2d at 1148. Newburn refused to comply with the district court’s order and was subsequently found in contempt. Id. at 370, 594 P.2d at 1148.
On appeal, Newburn contended that Nevada’s news shield statute was absolute and not subject to waiver under NRS 49.385. Id. at 371, 594 P.2d at 1148. Moreover, Newburn argued that the information he obtained was itself privileged and therefore not subject to the waiver provisions of NRS 49.385 because he was engaged in “investigative reporting” at the time he received it. Id. at 372, 594 P.2d at 1148-49.
In rejecting Newburn’s contentions and affirming the district court’s order, we first determined that “[a]ll privileges recognized by NRS Chapter 49 are explicitly subject to the waiver provisions of NRS 49.385.” Id. at 371, 594 P.2d at 1148. Next, we focused on the confidential character of the information disclosed. Id. at 372, 592 P.2d at 1149. Specifically, this court considered whether the information obtained and disclosed by Newburn was confidential and made the following observation:
The privilege against disclosure of a confidential matter is waived by a voluntary disclosure of any significant part. NRS 49.385(1). If the information disclosed by Newburn during the April 6 interview was not of a confidential character, he has no privilege to assert. On the other hand, if it was of a confidential character, it is evident that he did not consider it to have been received in confidence since he voluntarily disclosed that information and must be deemed to have waived any privilege conferred.
Id. Accordingly, this court concluded that either no privilege existed because the information was not confidential, or that Newburn waived the reporter’s privilege by voluntarily disclosing the information related to Howard Hughes’ estate. In his dissent, former Justice Gunderson stated that “the majority opinion incorrectly implies that whenever news personnel relate something they have discovered, in or out of print, a waiver results, thereby subjecting such personnel to interrogation upon ‘related’ matters. I am confident our Legislature never intended such a result.” Id. at 374, 594 P.2d at 1150.
*97 Nearly a decade after Newburn, this court again addressed the waiver statute as applied to the news shield statute, this time in the libel context in Las Vegas Sun. In Las Vegas Sun, Milton Schwartz brought a defamation suit against Herman and Brian Greenspun and the Las Vegas Sun for a series of editorials which he claimed defamed him. Las Vegas Sun, 104 Nev. at 510, 761 P.2d at 851. While preparing for trial, Schwartz sought discovery of a wide range of materials relating to the editorials. Id. In response, Herman Greenspun cited Nevada’s news shield statute as granting him an absolute privilege from disclosure. Id. Schwartz moved the district court for relief, and the district court ordered discovery of all materials relating to people, organizations or documents mentioned in the editorials. Id. The defendants then filed a petition for a writ of prohibition in this court. After considering the matter, we concluded that ‘ ‘the discovery order [was] too broad and intrude[d] upon the statutory privilege granted by the legislature.” Id. Consequently, we granted the petition.
In reviewing the news shield statute’s legislative history, we determined that the statute was intended to protect journalists from forced disclosure of their confidential sources. Las Vegas Sun, 104 Nev. at 511, 761 P.2d at 851. More specifically, we stated that “[t]he legislative history behind the current shield law illustrates the legislators’ concern with protecting confidentiality during and after the news gathering process. The legislature enacted the first shield law in 1969. It protected news media representatives from forced disclosure of their sources.” Id. Unfortunately, however, this excursion into legislative history bypassed the plain language of the news shield statute; namely, that journalists, when acting as such, are protected from disclosing any information that is gathered or prepared for public dissemination. As the news shield statute’s language is plain and unambiguous, no legislative history analysis was warranted. McKay, 102 Nev. at 648, 730 P.2d at 441.
This court also iterated that “[t]oday we again hold that a waiver under NRS 49.385 applies to the news gatherers’ privilege and describe more definite limitations on the breadth of waiver in matters relating to discovery of information held by news media defendants.” Las Vegas Sun, 104 Nev. at 513, 761 P.2d at 852. In delineating the scope of the waiver statute, we further stated that publication of a source and the source’s statements waives the news shield statute’s protection to the extent of the publication:
we conclude that the disclosure of a source and the attribution of remarks to that source is a clear cut waiver of the shield privilege as to that name and those statements. When a newspaper or broadcaster names its source and quotes statements made by that source, the underlying purpose of *98 the shield law is vitiated and the statutory privilege is waived. There is no claim of confidentiality to be made under these circumstances, as conceded by petitioners at the appeal hearing. [Footnote omitted.] Therefore, during the discovery process, news media litigants can properly be required to admit and document the precise matters disclosed in their publications or broadcasts.
Id., 761 P.2d at 852-53 (citations omitted).
The Newburn and Las Vegas Sun decisions suggest that confidentiality is a key consideration in determining whether the statutory news shield privilege has been waived. Both opinions fail, however, to recognize the distinction between privileges relating to confidential communications, and the reporter’s privilege, in determining whether the waiver statute applies.
Privileges relating to confidential communications, such as those between attorney and client, between doctor and patient, and between spouses, shield the confidentiality of communications within special relationships and are not designed or intended to assist the fact-finding process or to uphold its integrity. See John W. Strong, McCormick on Evidence, § 72, at 268-269 (4th ed. 1992). These privileges are justified by the public’s interest in encouraging socially useful communications and by certain notions of legitimate privacy expectations. See generally Developments in the Law—Privileged Communications, 98 Harv. L. Rev. 1450 (1985) (examining the evolution of evidentiary privileges in American law) [hereinafter Privileged Communications]. Accordingly, confidential communications made between persons in certain special relationships are privileged from compelled disclosure. Nevada’s legislature has expressly recognized such privileges. See NRS 49.095 (attorney-client privilege); NRS 49.185 (accountant-client privilege); NRS 49.209 (psychologist-patient privilege); NRS 49.225 (doctor-patient privilege); NRS 49.247 (therapist-patient privilege); NRS 49.252 (social worker-client privilege); NRS 49.295 (spousal privilege).[4] Generally, privileges *99 relating to special relationships can be waived by the source of the confidential information, whose identity is usually known. See Carl C. Monk, Evidentiary Privilege for Journalists’ Sources: Theory and Statutory Protection, 51 Mo. L. Rev. 1, 49 (1986) (examining the reporter’s privilege in state and federal jurisprudence) [hereinafter Evidentiary Privilege].
In contrast, the reporter’s privilege does not arise strictly as a result of confidence or a special relationship. This privilege arises when a journalist gathers information within his or her professional capacity for the purpose of dissemination. See NRS 49.275. The policy rationale behind this privilege is to enhance the newsgathering process and to foster the free flow of information encouraged by the First Amendment to the U.S. Constitution. See Evidentiary Privilege at 49. Accordingly, the privilege from compelled disclosure belongs to the journalist, not the source, who may be unidentified.
The Newbum and Las Vegas Sun courts’ misdirected focus on confidentiality is understandable, since the news shield statute’s history illustrates that the legislature was originally concerned with protecting the confidentiality of reporters’ sources. Additionally, the waiver statute expressly provides that the “privilege against disclosure of . . . confidential matter\s]” is subject to waiver. NRS 49.385(1) (emphasis added). Notwithstanding, the news shield statute’s plain language provides that the privilege against compelled disclosure applies to published as well as unpublished information.
As noted, the waiver statute speaks only to confidential information, the type of information that is pertinent in analyzing privileges related to confidential communications within special relationships. We therefore conclude that the waiver statute was intended, by its plain language, to apply to these types of privileges. The statute’s exceptions in subsection 2 underscore our conclusion: the waiver statute does not apply if the disclosure of a confidential matter “is . . . [ijtself a privileged commdnication[] or . . . [is] [m]ade to an interpreter employed merely to faciliate communications.” NRS 49.385(2)(a) and (b). “Privileged communication” is a term of art used to describe “[those statements made by certain persons within a protected relationship . . . which the law protects from forced disclosure.” Black’s Law Dictionary 1198 (6th ed. 1990). Thus, a “confiden *100 tial matter’ ’ is not subject to compelled disclosure if it is divulged in the context of another protected relationship. See Cheyenne Construction v. Hozz, 102 Nev. 308, 720 P.2d 1224 (1986) (holding in an action for breach of contract, that where plaintiff’s attorney testified as to his dealings with defendant, plaintiff did not waive the privilege to refuse to disclose and prevent others from disclosing confidential communications between plaintiff and his attorney). Similarly, a confidential communication is not rendered discoverable if made through an interpreter. See NRS 49.385(2)(b).
While confidentiality may be one important factor in communications between a journalist and the source of information, confidentiality is not the defining factor in the existence of the reporter’s privilege, nor does confidentiality play a role in determining whether a- reporter has waived the privilege. The news shield statute protects all information, not just confidential information, which is obtained by a reporter in his or her capacity as a journalist and which is intended for dissemination. If the waiver statute applied to the news shield statute, as the Newbum and Las Vegas Sun courts determined, then by publishing confidential information, a reporter has waived the news shield privilege as to that information. Such a result vitiates the plain language of the news shield statute, which protects published information from compelled disclosure. Accordingly, we conclude that the waiver statute does not apply to the privilege created by the news shield statute. Instead, as discussed above, the waiver statute is limited to those privileges that center on confidential communications.
Our reading of the statutory provisions at issue in this petition is consistent with the public policy rationale. behind the news shield statute. Nevada’s news shield statute serves an important public interest and provides absolute protection against compelled disclosure to ensure that through the press, the public is able to make informed political, social and economic decisions. See Testimonial Shield Statute at 801.
As our Newbum and Las Vegas Sun opinions applied the waiver statute to the news shield statute, and attempted to define the scope of the news shield statute based on confidentiality, we must overrule Newbum and, in large part, Las Vegas Sun. Newbum’s conclusion, that a reporter who voluntarily discloses information obtained in the newsgathering process waives any privilege with respect to that information, cannot withstand scrutiny when examined in light of the news shield statute’s broad and unambiguous *101 protection of published information.[5] Similarly, Las Vegas Sun is overruled to the extent that it mirrors Newburn’s analysis of confidentiality and waiver. Nevertheless, we reaffirm our ruling in Las Vegas Sun as it pertains to actions for libel. In particular, as we stated in that opinion, once a media litigant has invoked the protection of the news shield statute to resist discovery, the defendant may not later rely on the privileged information as a defense.[6] Las Vegas Sun, 104 Nev. at 514, 761 P.2d at 853-54.
We emphasize that our decision today extends protection only to the journalist’s newsgathering and dissemination activities within the journalist’s professional capacity. Nevada’s news shield statute provides no protection for information gathered in other capacities. We further recognize that although the news shield statute provides an absolute privilege to reporters engaged in the newsgathering process, there may be certain situations, e.g., when a defendant’s countervailing constitutional rights are at issue, in which the news shield statute might have to yield so that justice may be served.
As a final point, we note that in litigation such as the underlying case, where the story has been widely disseminated, an effort to use the news media to produce evidence beneficial to a litigant is not a function of the news media, and the shield statute protects it from such abuse.

CONCLUSION

Nevada’s news shield statute is not limited to confidential sources, but includes any source. The shield statute covers both published and unpublished information, and includes both the information obtained and the source of the information. Thus, *102 Nevada’s waiver statute does not apply with respect to the news shield statute. Under Nevada law, a journalist does not waive any rights or privileges by publication.
Accordingly, our intervention by way of extraordinary relief is not warranted, and we deny this petition.[7]
Rose, C. J., and Becker, J., concur.[8]

As this matter is a writ petition filed prior to trial of the underlying case, the record before this court is limited; accordingly, allegations of intoxication remain to be determined in the district court.

With regard to the liability of the state and the NHP, petitioners’ strategy at trial appears to include arguing that once Trooper Kennedy determined that Estrada was intoxicated, he was required to place Estrada under civil protective custody instead of driving Estrada home. NRS 458.270(1) provides that, generally, “a person who is found in any public place under the influence of *93 alcohol, in such a condition that he is unable to exercise care for his own health or safety or the health or safety of others, must be placed under civil protective custody by a peace officer.”

On April 13, 1999, this court granted the Nevada Press Association’s motion for leave to file an amicus curiae brief and directed the clerk of this court to file the brief. See NRAP 29.

Nevada’s legislature also recognizes a medical or dental peer-review privilege as set forth in NRS 49.265. Doctrinally and analytically the peer-review privilege raises distinct concerns from the special relationship privileges cited above. Most notably, unlike the special relationship privileges which protect personal privacy interests that generally affect the great majority of society, the peer-review privilege protects the underlying needs of the institution. See Privileged Communications at 1594. Twice this court has addressed the scope of Nevada’s peer-review privilege. See Columbia/HCA Healthcare v. Dist. Court, 113 Nev. 521, 936 R2d 844 (1997) (holding occurrence reports are not exempt from discovery); Ashokan v. State, Dep’t of Ins., 109 Nev. 662, 856 R2d 244 (1993) (holding records acquired without recourse to discovery *99 proceedings are not exempt from discovery). Today, we need not and do not address whether the waiver statute applies to the peer-review privilege.

The Newburn court concluded that the record supported the district court’s finding that Newburn was not gathering information for the purpose of dissemination. Newburn, 95 Nev. at 372, 594 P.2d at 1149. Ostensibly, the Newburn court could have determined that since Newburn did not obtain the information regarding Hughes’ will with the intent to publish it, that Newburn was exempt from the protection of the shield statute. In overruling Newburn, we do not intend to suggest that any voluntary disclosure of information by a reporter falls within the definition of “published” under the statute, only that the dissemination in this case clearly was protected publication. Whether Newburn’s conduct was within the definition of “published” was not adequately discussed in the Newburn decision, and we decline to address the issue today.

Moreover, to the extent that a plaintiff in a defamation action is required to prove that a media litigant either knew that the published information was false or acted in reckless disregard of the truth, an assertion of the shield statute may result in discovery sanctions.

We need not address Puit’s first amendment argument. See Director, Dep’t Prisons v. Arndt, 98 Nev. 84, 86, 640 P.2d 1318, 1320 (1982) (noting that “[i]t is well settled that this court will not address constitutional issues unless the[y] are requisite to the disposition of a case”).