**Mark V. SHOEN; Edward J. Shoen, Plaintiffs–Appellees,**

v.

**Leonard Samuel SHOEN; Christina G. Shoen, et al., Defendants,**

**Ronald J. Watkins, Witness–Appellant.**

No. 94–16533.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Oct. 17, 1994.

Decided Feb. 15, 1995.

Guy Bradley Price, Phoenix, AZ, for appellant Watkins.

Richard M. Amoroso, Piccoli & Myers, Phoenix, AZ, for appellee Mark Shoen.

Russell Piccoli, Piccoli & Myers, Phoenix, AZ, for appellee Edward Shoen.

Daniel C. Barr and Shirley A. Kaufman, Brown & Bain, Phoenix, AZ, for amicus curiae First Amendment Coalition of Arizona.

Jane E. Kirtley, Washington, DC, for amicus curiae The Reporters Committee for Freedom of the Press.

Thomas H. Howlett, Ross, Dixon & Masback, Washington, DC, for amicus curiae Newsletter Publishers Ass'n.

David J. Bodney and Peter B. Swann, Steptoe & Johnson, Phoenix, AZ, for amicus curiae Arizona Newspapers Ass'n, Radio–Television News Directors Ass'n, and Ass'n of American Publishers.

Before: BROWNING, FARRIS and LEAVY, Circuit Judges.

Opinion by Judge FARRIS; Dissent by Judge LEAVY.

FARRIS, Circuit Judge.

Ronald J. Watkins appeals from the district court judgment holding him in contempt for refusing to produce audio tapes and other materials pursuant to a discovery request in the underlying defamation lawsuit. Watkins contends that the journalist's privilege against compelled disclosure of research material shields him from plaintiffs' discovery requests. We have jurisdiction under 28 U.S.C. §§ 1291 and 1826(a). We reverse.

## BACKGROUND

The Shoen family owns and operates the highly successful U–Haul Corporation. Watkins, an author of investigative books, recently published *Birthright*, which chronicles the bitter feud within the Shoen family for control of U–Haul. It also details the events surrounding the death of Eva Berg Shoen, who was brutally murdered at the family's cabin in Telluride, Colorado.

A primary source for the book was Leonard Shoen, the family patriarch and founder of U–Haul. In exchange for several in-depth interviews, Watkins agreed that Leonard Shoen would receive a percentage of book royalties and proceeds from any sales of movie rights.

Prior to his interviews with Watkins, Leonard Shoen made at least 29 public statements, most to the press, implicating his sons Mark and Edward in the death of Eva Berg Shoen, the wife of their brother Sam. In this action, Mark and Edward Shoen seek to hold their father liable for the alleged damage to their reputations occasioned by these statements.

Plaintiffs do not allege that their father made any libelous statements to Watkins. Nonetheless, shortly after commencing this action, they served Watkins with a subpoena duces tecum ordering him to appear for deposition and to produce all documents and recordings concerning the Shoen family feud over U–Haul and the death of Eva Berg Shoen. Watkins refused. After a flurry of motions, the district court ordered Watkins to produce all notes and tapes of his conversations with Leonard Shoen on matters related to the Shoen family. When Watkins again refused, the district court held him in contempt.

In *Shoen v. Shoen,* 5 F.3d 1289 (9th Cir. 1993) ("*Shoen I* "), we reversed the district court's contempt order. We held that plaintiffs had failed to demonstrate a sufficiently compelling need for the information to overcome Watkins' assertion of the journalist's privilege. We concluded that, at a minimum, plaintiffs had to depose Leonard Shoen before seeking Watkins' tapes and notes. *Id.* at 1296–98.

Between oral argument and announcement of our decision in *Shoen I,* plaintiffs deposed Leonard Shoen and conducted modest additional discovery. Evidently under the impression that they had satisfied their obligation to exhaust all reasonable alternative sources, three days after the *Shoen I* decision plaintiffs again demanded Watkins' tapes and notes of his conversations with Leonard Shoen.

Plaintiffs moved to compel Watkins to disclose the requested materials, but the district court deferred consideration of the motion pending disposition of a summary judgment motion on the question of public figure status. On March 10, 1994, the court held that plaintiffs are public figures for purposes of this litigation. Agreeing that plaintiffs had exhausted all reasonable alternative sources, the district court then granted the motion to compel Watkins to comply with plaintiffs' discovery requests. The court directed Watkins to appear for a scheduled deposition and to produce the tapes and notes of his conversations with Leonard Shoen about the Shoen family disputes and Eva Shoen's murder. Watkins again refused.

On August 19, 1994, following oral argument on whether Watkins should be held in contempt, the district court ordered that unless he immediately complied with its previous order, Watkins would be incarcerated until he agreed to comply or until the underlying litigation terminated. On September 1, 1994, the district court found Watkins to be a recalcitrant witness under 28 U.S.C. § 1826(a) and ordered his immediate incarceration. We stayed the incarceration order pending disposition of this appeal.

## DISCUSSION

Whether plaintiffs have made a sufficient showing to overcome Watkins' assertion of the journalist's privilege is a mixed question of law and fact. *Shoen I,* 5 F.3d at 1292. We therefore review de novo. *Id.*

### I.  *Shoen I*

As we noted in *Shoen I,* all but one of the federal circuits to address the issue have interpreted *Branzburg v. Hayes,* 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972), as establishing a qualified privilege for journalists against compelled disclosure of information gathered in the course of their work. *Shoen I,* 5 F.3d at 1292 n. 5 (citing cases). "Rooted in the First Amendment, the privilege is a recognition that society's interest in protecting the integrity of the newsgathering process, and in ensuring the free flow of information to the public, is an interest 'of sufficient social importance to justify some incidental sacrifice of sources of facts needed in the administration of justice.'" *Id.* at 1292 (quoting *Herbert v. Lando,* 441 U.S. 153, 183, 99 S.Ct. 1635, 1652, 60 L.Ed.2d 115 (1979) (Brennan, J., dissenting) (internal quotation omitted)).

In *Shoen I,* we confronted two issues of first impression in this circuit: (1) whether the journalist's privilege extends to investigative book authors such as Watkins; and (2) whether the privilege protects nonconfidential sources and materials. *Shoen I,* 5 F.3d at 1293. Because we decided both issues in the affirmative, we proceeded to determine whether plaintiffs had demonstrated a "sufficiently compelling need" for the requested

materials to overcome Watkins' assertion of the journalist's privilege. *Id.* at 1296. We noted that, "[a]t a minimum, this requires a showing that the information sought is not obtainable from another source." *Id.*

Our inquiry was short lived. As of the time of the appeal, plaintiffs had not deposed Leonard Shoen, the " 'most patently available other source.' " *Id.* at 1297 (quoting *Riley v. City of Chester,* 612 F.2d 708, 717 (3d Cir. 1979)). We concluded that plaintiffs had therefore failed to exhaust all reasonable alternative means for obtaining the information sought from Watkins. *Id.* at 1296–98.

## II.  The Disagreement Over *Shoen I*

The parties vigorously dispute the showing required under *Shoen I* to overcome the journalist's privilege. The district court read *Shoen I* as setting forth three factors to be considered when determining whether the journalist's privilege should yield to a civil litigant's discovery requests: (1) whether the requesting party has exhausted all reasonable alternative sources; (2) whether the information sought is relevant, material, and noncumulative; and (3) whether the information sought is crucial to the maintenance of the plaintiffs' legal claims.

Watkins contends that the *Shoen I* court adopted a four-part test that includes a showing that the requested information goes to the "heart of the seeker's case." According to Watkins, the approving citation to *Los Angeles Memorial Coliseum Comm'n v. National Football League,* 89 F.R.D. 489, 494 (C.D.Cal.1981), reflects our adoption of such a test.

Watkins' argument is unpersuasive. The citation relied upon by Watkins appears in a footnote. The footnote reads:

> Because we hold that plaintiffs have not satisfied the exhaustion requirement, we express no opinion on whether plaintiffs have made a sufficient showing on the other questions considered in the balance—i.e., whether the information sought is relevant, material, and non-cumulative, and whether it is crucial to the maintenance of plaintiffs' legal claims. *See generally In re Petroleum Prods. [Antitrust Litigation], supra* [680 F.2d 5] at 7 [ (2d

Cir.1982) ]; *Los Angeles Memorial Coliseum Comm'n v. National Football League,* 89 F.R.D. 489, 494 (C.D.Cal.1981) (and cases cited therein).

*Shoen I,* 5 F.3d at 1296 n. 14. It is clear from this language that the *Shoen I* court did not adopt a test for determining whether the requesting party has a compelling need sufficient to override the privilege. Surely, had the court chosen to announce such a test, it would not have done so in a footnote.

## III.  The Need to Adopt a Test

In reaffirming a qualified journalist's privilege, we observed in *Shoen I* that "the process of deciding whether the privilege is overcome requires that 'the claimed First Amendment privilege and the opposing need for disclosure be judicially weighed in light of the surrounding facts, and a balance struck to determine where lies the paramount interest.' " *Shoen I,* 5 F.3d at 1292–93 (quoting *Farr v. Pitchess,* 522 F.2d 464, 468 (9th Cir.1975)); *see also Branzburg,* 408 U.S. at 710, 92 S.Ct. at 2671 (Powell, J., concurring) (balance must be struck between freedom of the press and obligation to give relevant testimony). We have yet to formalize this balance by identifying the specific showing required to pierce the journalist's privilege. *See LaRouche v. National Broadcasting Co.,* 780 F.2d 1134, 1139 (4th Cir.) (noting that courts have developed three-part test to assist in balancing interests), *cert. denied,* 479 U.S. 818, 107 S.Ct. 79, 93 L.Ed.2d 34 (1986); *Zerilli v. Smith,* 656 F.2d 705, 713 (D.C.Cir. 1981) ("A number of more precise guidelines can be applied to determine how the balance should be struck in a particular case."). We do so here for two reasons: (1) to alleviate the type of uncertainty expressed by the district court and the parties; and (2) because it allows us to resolve with finality the question of whether Watkins must furnish the requested materials.

## IV.  The Required Showing

As a backdrop to our discussion of the appropriate test for determining whether a civil litigant's interest in disclosure is sufficient to override a journalist's privilege, we

recognize that routine court-compelled disclosure of research materials poses a serious threat to the vitality of the newsgathering process. *United States v. LaRouche Campaign*, 841 F.2d 1176, 1182 (1st Cir.1988) ("We discern a lurking and subtle threat to journalists and their employers if disclosure of outtakes, notes, and other unused information, even if nonconfidential, becomes routine and casually, if not cavalierly, compelled."). The *Shoen I* court, in its discussion of whether the journalist's privilege applies in the absence of confidentiality, listed the following interests of the media in avoiding compliance with discovery requests:

> "[t]he threat of administrative and judicial intrusion into the newsgathering and editorial process; the disadvantage of a journalist appearing to be an investigative arm of the judicial system or a research tool of government or of a private party; the disincentive to compile and preserve nonbroadcast material; and the burden on journalists' time and resources in responding to subpoenas."

*Shoen I*, 5 F.3d at 1294–95 (quoting *LaRouche Campaign*, 841 F.2d at 1182). The court further observed that frequent court-compelled disclosures may well encourage destruction of research materials soon after publication or broadcast. *Shoen I*, 5 F.3d at 1295. The test we adopt must therefore ensure that compelled disclosure is the exception, not the rule. As the District of Columbia Circuit has observed, "in the ordinary case the civil litigant's interest in disclosure should yield to the journalist's privilege. Indeed, if the privilege does not prevail in all but the most exceptional cases, its value will be substantially diminished." *Zerilli*, 656 F.2d at 712 (footnote omitted).

Leonard Shoen was neither a confidential source nor did he insist that the details of his discussions with Watkins not be disclosed. No circuit has adopted an explicit test applicable where the information sought from a journalist is not confidential. Instead, the cases setting forth tests for determining whether the needs of a civil litigant should prevail over the privilege involve confidential informants. The Second Circuit, for example, applies the following conjunctive test for

determining whether a journalist must disclose a confidential source in a civil case:

> disclosure may be ordered only upon a clear and specific showing that the information is: highly material and relevant, necessary or critical to the maintenance of the claim, and not obtainable from other available sources.

*In re Petroleum Products Antitrust Litig.*, 680 F.2d 5, 7 (2d Cir.), *cert. denied*, 459 U.S. 909, 103 S.Ct. 215, 74 L.Ed.2d 171 (1982); *see also LaRouche*, 780 F.2d at 1139 (applying similar three-part test); *Miller v. Transamerican Press*, 621 F.2d 721, 726, *supplemented*, 628 F.2d 932 (5th Cir.1980) (same), *cert. denied*, 450 U.S. 1041, 101 S.Ct. 1759, 68 L.Ed.2d 238 (1981); *Zerilli*, 656 F.2d at 713–15 (requesting party must show exhaustion of all reasonable alternative sources and that the information sought is "crucial to his case.").

In *Shoen I*, we observed that "the lack of a confidential source may be an important element in balancing the . . . need for the material sought against the interest of the journalist in preventing production in a particular case." *Shoen I*, 5 F.3d at 1295–96 (quoting *United States v. Cuthbertson*, 630 F.2d 139, 147 (3d Cir.1980), *cert. denied*, 449 U.S. 1126, 101 S.Ct. 945, 67 L.Ed.2d 113 (1981)). We therefore hold that where information sought is not confidential, a civil litigant is entitled to requested discovery notwithstanding a valid assertion of the journalist's privilege by a nonparty only upon a showing that the requested material is: (1) unavailable despite exhaustion of all reasonable alternative sources; (2) noncumulative; and (3) clearly relevant to an important issue in the case. We note that there must be a showing of actual relevance; a showing of potential relevance will not suffice.

## V. Have Plaintiffs Made the Requisite Showing?

Plaintiffs argue that Watkins' assertion of the journalist's privilege should yield because the requested materials may demonstrate Leonard Shoen's actual malice when making the allegedly defamatory statements. Plaintiffs further submit that the tapes and notes may provide a basis upon which to impeach

testimony by Leonard Shoen that he loved his sons and harbored no ill will toward them.

### 1. Demonstration of Actual Malice

■ The district court found that plaintiffs are limited purpose public figures under the test established in *Waldbaum v. Fairchild Publications, Inc.*, 627 F.2d 1287, 1296–98 (D.C.Cir.), *cert. denied,* 449 U.S. 898, 101 S.Ct. 266, 66 L.Ed.2d 128 (1980). To establish defamation, plaintiffs must therefore prove that the statements complained of were (1) false, and (2) made with knowledge of their falsehood or with reckless disregard of the truth. *New York Times v. Sullivan,* 376 U.S. 254, 279–80, 84 S.Ct. 710, 725–26, 11 L.Ed.2d 686 (1964). The second prong is the "actual malice" requirement. *Id.* at 280, 84 S.Ct. at 726.

■ Under Arizona defamation law, actual malice may be shown by circumstantial evidence. *Currier v. Western Newspapers,* 175 Ariz. 290, 294, 855 P.2d 1351, 1355 (1993). Moreover, ill will is considered circumstantial evidence of actual malice. *Id.* Plaintiffs argue that because Watkins and Leonard Shoen discussed at length the Shoen family battle for control of U–Haul and Eva Shoen's murder, the tapes and notes may well contain evidence of Leonard Shoen's ill will toward them. We reject the argument.

■ Watkins first interviewed Leonard Shoen on September 8, 1991. Twenty-five of the twenty-nine alleged libels were made, however, between September 1990 and March 1991, many months before the interviews commenced. The remaining four were made in early August 1991. Under *New York Times* plaintiffs must show that, at the time he made the statements, Leonard Shoen knew that they were false or recklessly disregarded their falsity. *New York Times,* 376 U.S. at 280, 84 S.Ct. at 726. A showing that Leonard Shoen harbored ill will toward his sons at a time after the alleged libels—even only one month later—cannot, without more, establish actual malice. *See id.; see also Greenbelt Cooperative Publishing Ass'n v. Bresler,* 398 U.S. 6, 10–11, 90 S.Ct. 1537, 1539–40, 26 L.Ed.2d 6 (1970) ("spite, hostility, or deliberate intention to harm" not equivalent to actual malice). As a result, Leonard Shoen's September 1991 statements, if any, regarding his attitude toward plaintiffs are not clearly relevant to an important issue in this litigation.[1]

■ Although plaintiffs' failure to establish clear relevance to an important issue is dispositive, we nonetheless note that the requested material is also cumulative insofar as it pertains to the question of ill will. There has been considerable litigation between Leonard Shoen and his sons Mark and Edward. Moreover, during his deposition, Leonard Shoen repeatedly referred to at least one of his sons as "Hitler," and stated that he believed his sons were sociopaths. He also made numerous statements denouncing his sons' abilities to manage the U–Haul company. A jury could reasonably infer from these statements alone that Leonard Shoen had ill will toward his sons.

Plaintiffs also contend that, by his own concession, Leonard Shoen discussed with Watkins his motivation for making the allegedly defamatory statements. This contention is not supported by the record.

Leonard Shoen admitted during his deposition that he discussed with Watkins his motivations for agreeing to be a source for the book; namely, his determination to discover the true murderers of Eva Shoen. There is no evidence, however, that they discussed Leonard Shoen's motivation for making the statements implicating his sons in the murder. To the contrary, Watkins has signed three affidavits stating that he and

---

1. The dissent argues that because the extent of Leonard Shoen's knowledge about his sons' alleged involvement in Eva Berg Shoen's murder bears on the question of actual malice, his discussions with Watkins about the murder are clearly relevant. This argument fails to recognize that the extent of Leonard Shoen's knowledge about the murder at the time of the Watkins interviews—which began a year after the bulk of the alleged libels—sheds little light on the extent of his knowledge or disregard for the truth at the time he made the statements to the press. The plaintiffs' asserted need for the interview tapes focuses on the question of ill will, not Leonard Shoen's knowledge of the circumstances surrounding Eva Berg Shoen's death.

Leonard Shoen did not discuss the allegedly defamatory statements.

### 2. Impeachment

■ Similarly unavailing is plaintiffs' argument that Watkins' tapes and notes are important to their case because they might provide valuable impeachment material on the question of whether Leonard Shoen harbors ill will toward them. To the extent the requested materials would demonstrate that Leonard Shoen was less than candid during his deposition, they do not relate to an important issue in this case. Whether Leonard Shoen stated falsely during the deposition that he loved his sons is collateral; the important issue is whether he had actual malice at the time he made the allegedly defamatory statements.

### CONCLUSION

To overcome a valid assertion of the journalist's privilege by a nonparty, a civil litigant seeking information that is not confidential must show that the material is: (1) unavailable despite exhaustion of all reasonable alternative sources; (2) noncumulative; and (3) clearly relevant to an important issue in the case. Plaintiffs fail to make this showing. The order holding Watkins in contempt is vacated.

### REVERSED AND REMANDED.

LEAVY, Circuit Judge, dissenting:

Ronald Watkins ("Watkins") argues that he should be allowed to interpose a qualified privilege to block the plaintiffs from examining evidence which they claim is critical to their case. Despite the fact that (1) Watkins' source, Leonard Shoen ("Shoen"), was a paid, nonconfidential informant who never insisted that the evidence he provided be kept secret; (2) much of what Shoen told Watkins is now a matter of public record; and (3) the plaintiffs have been frustrated in their efforts to obtain this information in any other way, the majority concludes that Watkins' assertion of this qualified privilege should act as an absolute bar to the plaintiffs. I must respectfully dissent.

The majority adopts a three-prong test for determining whether, and under what circumstances, the assertion of a journalist's qualified privilege must yield to a discovery request for nonconfidential information possessed by the journalist. Specifically, a party seeking discovery must now show that the evidence sought is (1) practically unavailable from any other source; (2) noncumulative; and (3) clearly relevant to an important issue in the litigation. *See* maj. op. at 415–416.

Against these three factors we must consider

> the threat of administrative and judicial intrusion into the newsgathering and editorial process; the disadvantage of a journalist appearing to be an investigative arm of the judicial system or a research tool of government or of a private party; the disincentive to compile and preserve nonbroadcast material; and the burden on journalists' time and resources in responding to subpoenas.

*Shoen v. Shoen* ("*Shoen I*"), 5 F.3d 1289, 1294–95 (9th Cir.1993) (quoting *United States v. La Rouche Campaign*, 841 F.2d 1176, 1182 (1st Cir.1988) (internal quotations omitted)).

Without discussing the first prong of this test as it applies to the facts of the instant appeal, the majority holds that the plaintiffs have failed to carry their burden of proof with respect to the second and third prongs. Turning first to the third prong, the majority cites to *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964) and *Greenbelt Coop. Pub. Ass'n v. Bresler*, 398 U.S. 6, 90 S.Ct. 1537, 26 L.Ed.2d 6 (1970) as support for their conclusion that Shoen's statements to Watkins "are not clearly relevant to an important issue in this litigation[,]" maj. op. at 417, because all twenty-nine of the alleged libels occurred prior to Watkins' first interview.

Neither *Sullivan* nor *Bresler* stands for the proposition that evidence is somehow rendered irrelevant by the mere passage of time. Indeed, to hold as the majority does on this point would effectively preclude the admission of *any* evidence that does not coincide precisely with the time of allegedly defamatory act(s). Moreover, Shoen's com-

ments to Watkins on the subject of the murder of his daughter-in-law, Eva Berg Shoen ("Eva"), have a direct bearing on the plaintiffs' claim of actual malice: The whole defamation action arose out of Shoen's accusation that the plaintiffs were involved in Eva's death, which was the subject of the in-depth interviews between Watkins and Shoen. I have no doubt that, if we knew the contents of those interviews, we would know the extent of Shoen's knowledge of the details of Eva's death. If Shoen had no such knowledge, the trier of fact could conclude that he likewise had no knowledge of the details of that event when he published the allegedly defamatory statements. If, on the other hand, Shoen knew any of the details as of September 8, 1991, it would be left only to determine when he acquired that knowledge and from what source. In short, I can think of no more relevant evidence available to any party that would help the trier of fact to determine whether, at the time Shoen published the allegedly defamatory statements, he may have known they were false or acted with reckless disregard for the truth.

Turning from the third prong to the second, the majority concludes in the alternative that the evidence sought would be cumulative, anyway, because there is other evidence showing that Shoen bore considerable ill will against the plaintiffs. However, it is not enough under *Sullivan* to prove mere ill will on Shoen's part; rather, the plaintiffs must prove the extent of his knowledge. Moreover, while it is true that there is evidence of Shoen's animosity other than that possessed by Watkins, there obviously can be no better evidence, nor any evidence so clearly pertinent to the question of Shoen's mind-set, as it bears on his allegations of the plaintiffs' complicity in Eva's murder. Accordingly, any evidence of Shoen's actual knowledge of the details of Eva's murder is noncumulative, and the requested material is practically unavailable, despite the plaintiffs' exhaustion of all reasonable alternative sources.

It was pointed out in *Shoen I* that the absence of confidentiality may be considered in the balancing of competing interests as a factor that serves to diminish both the journalist's and the public's interests in nondisclosure. 5 F.3d at 1295–96. Thus, any consideration of the public's right to the free flow of information in the instant case must be tempered by two facts: First, the trial court offered to allow Watkins to redact any material that might suggest the existence and identity of a confidential source; and, second, Shoen is to have a share in future royalties on the book and any possible movie deal.

I find this second fact to be very important, and think it is fair to say that, in a case involving a nonconfidential source who is being paid by the witness, disclosure may only tend to drive up the price, rather than shut down the "free" flow, of information. With respect to the facts of this particular case, and aside from their agreement to share the book and movie proceeds, Watkins—whom Shoen refers to as a "novelist," *see Shoen I*, 5 F.3d at 1296—owes no professional ethical duty to Shoen.

Finally, and almost as an aside, the majority rejects the plaintiffs' contention that Watkins' tapes and notes would be invaluable impeachment material because, "[w]hether Leonard Shoen stated falsely during the deposition that he loved his sons is collateral; the important issue is whether he had actual malice at the time he made the allegedly defamatory statements." Maj. op. at 418. However, the plaintiffs are not particularly interested in proving that Shoen lied at his deposition about the degree of his affection for them; rather, they seek to prove the existence of actual malice as defined by *Sullivan*.

In light of the above, I believe that the plaintiffs have more than carried their burden with respect to all three prongs of the test enunciated here, and have thereby made a showing sufficient to overcome Watkins' assertion of the journalist's qualified privilege against disclosure of the requested material. I would therefore affirm the district court's order of contempt.