993 P.2d 50 (2000)
Rosalva DIAZ; Eduardo Jesus Diaz, a Minor by and Through His Guardian Ad Litem Rosalva Diaz; Katia Guadalupe Alcantara, a Minor by and Through Her Guardian Ad Litem Jose Antonio Zermeno; Estephania Alcantara, a Minor by and Through Her Guardian Ad Litem Jose Antonio Zermeno; Maria Estrada; and Michael Anthony Estrada, a Minor by and Through His Guardian Ad Litem, Veronica Molina, Petitioners,
v.
The EIGHTH JUDICIAL DISTRICT COURT of the State of Nevada, In and For the COUNTY OF CLARK, and the Honorable Mark W. Gibbons, District Judge, Respondents, and
Glenn Puit, Real Party in Interest.
No. 32968.
Supreme Court of Nevada.
January 27, 2000.
*52 Your Legal Power, Herbert L. Michel Jr., Las Vegas, for Petitioners.
Frankie Sue Del Papa, Attorney General, Bridget A. Branigan, Deputy Attorney General, Carson City, Alverson Taylor Mortensen Nelson & Sanders, Kurt Anderson, Las Vegas, for Respondents.
Lionel Sawyer & Collins, Kevin D. Doty, Las Vegas, for Real Party in Interest.
JoNell Thomas, Las Vegas, for Amicus Curiae, Nevada Press Association.
BEFORE THE COURT EN BANC.

OPINION
LEAVITT, J.
This original petition for a writ of mandamus or prohibition challenges an order of the district court that denied petitioners' motion to compel the real party in interest to answer deposition questions. The real party in interest, a news reporter, invoked the protection of Nevada's news shield statute against compelled disclosure of information he obtained while investigating a fatal traffic accident. As we conclude that the news shield statute affords reporters a privilege from compelled disclosure of the contents of a published article, we conclude that extraordinary relief is not warranted; consequently, we deny the petition.

FACTS
On September 21, 1996, at approximately 1:00 a.m., Nevada Highway Patrol ("NHP") trooper John Kennedy responded to a dispatch stating that a person was lying in a northbound lane of Interstate 95 at the Summerlin Parkway off ramp in Las Vegas. Upon arriving at the scene, Trooper Kennedy approached the person, who was identified as Michael Estrada. The record before this court is unclear as to what transpired next. Trooper Kennedy testified during his deposition that he detected the odor of alcohol on Estrada's breath and that Estrada admitted that he had been drinking. The record also reveals from the NHP dispatch transcript that, as Trooper Kennedy was en route to the scene, the NHP dispatcher informed the Las Vegas Metropolitan Police that there was no need for their involvement; the dispatcher stated, "[W]e're there and it's just a broken down vehicle." Trooper Kennedy later informed the NHP dispatcher that Estrada was the registered owner of the vehicle but that Estrada claimed he had been riding as a passenger in the vehicle. According to the transcript, Trooper Kennedy explained to the dispatcher that "[t]he reason the vehicle is ... being towed is it stalled in the travel lane and as soon as we get clear here I'll be [transporting Estrada] to his ... residence." Trooper Kennedy arranged for Estrada's vehicle, which was parked on the shoulder of the road, to be towed and then drove Estrada home.
Later that day, at approximately 12:30 p.m., Estrada, his wife, daughter, and stepson retrieved Estrada's vehicle from the towing company. Estrada drove away in the *53 vehicle, with his stepson as a passenger, while his wife and daughter followed in another vehicle. Shortly thereafter, Estrada and his stepson were involved in a collision with another vehicle. Estrada, his stepson, and all three people in the other vehicle were killed. Petitioners, who are relatives of the five victims of the fatal accident, assert that Estrada was intoxicated at the time of the accident.[1] Following the accident, petitioners filed a wrongful death action against the state, the NHP, and the towing company.
During discovery, petitioners deposed Trooper Harney, an NHP public information officer, who had been quoted in articles about the accident that appeared in the Las Vegas Review-Journal. Specifically, the articles, which were authored by real party in interest Glenn Puit, credit Harney with stating, among other things, that "troopers" questioned Estrada "hours before the fatal pileup for suspicion of drunk driving." Additionally, Trooper Harney is reported as stating that "troopers could not charge Estrada with drunken driving because Estrada did not have the keys [to the vehicle] in his possession and there were no witnesses who could say he was behind the wheel." At his deposition, Trooper Harney testified that to the best of his recollection, what he told Puit about the encounter was that the NHP "responded to an abandoned vehicle alongside the roadway; and that there was a gentleman there that was sitting off the roadway; and that we had asked him if he ... was driving the vehicle; and he stated that a friend was and had left; and ... that there was no ... witness to place him behind the wheel of the automobile; and based on that we did not arrest him." Furthermore, during his deposition, Trooper Harney claimed that he could not remember whether he had made certain statements attributed to him in the articles, so he deferred to the articles.
Petitioners later attempted to depose, in an apparent effort to impeach Trooper Kennedy and other law enforcement officers who had given statements inconsistent with those attributed to Trooper Harney in the Review-Journal articles. At his deposition, Puit refused to answer questions by citing the reporter's privilege as conferred by NRS 49.275, Nevada's news shield statute.
Subsequently, petitioners filed a motion to compel Puit to answer the questions. Puit, who was joined by the NHP, opposed the motion. The discovery commissioner concluded that both Nevada's news shield statute and the First Amendment-based reporter's privilege required that petitioners' motion to compel be denied. The district court adopted the discovery commissioner's report and recommendations, despite petitioners' objections.
Petitioners then filed a motion for reconsideration, which the district court granted. Although the district court found the information sought by petitioners to be probative and relevant as impeachment evidence, it determined that Puit could not be compelled to testify pursuant to Nevada's news shield statute. Accordingly, the district court reaffirmed the discovery commissioner's report and recommendations.
Petitioners subsequently filed this original petition for writ of mandamus or prohibition, to which Puit has filed an answer.[2]

DISCUSSION

I. Extraordinary relief

A writ of mandamus may be issued to compel the performance of an act that the law requires as a duty resulting from an office, trust or station, or to control an arbitrary or capricious exercise of discretion. See State ex rel. Dep't Transp. v. Thompson, *54 99 Nev. 358, 662 P.2d 1338 (1983); Round Hill Gen. Imp. Dist. v. Newman, 97 Nev. 601, 637 P.2d 534 (1981). A writ of prohibition, in turn, is the "proper remedy to restrain a district [court] from exercising a judicial function without or in excess of its jurisdiction." Smith v. District Court, 107 Nev. 674, 677, 818 P.2d 849, 851 (1991). Either writ will only issue where "there is not a plain, speedy and adequate remedy in the ordinary course of law." NRS 34.170; NRS 34.330.
Generally, extraordinary relief is unavailable to review discovery orders. See Hetter v. District Court, 110 Nev. 513, 515, 874 P.2d 762, 763 (1994). Thus, we could conclude that petitioners have a plain, speedy and adequate remedy at law that would preclude extraordinary relief, since petitioners may challenge the district court's order in an appeal from an adverse final judgment. See Clark County Liquor v. Clark, 102 Nev. 654, 730 P.2d 443 (1986). Nevertheless, "where an important issue of law needs clarification and public policy is served by this court's invocation of its original jurisdiction, ... consideration of a petition for extraordinary relief may be justified." Business Computer Rentals v. State Treas., 114 Nev. 63, 67, 953 P.2d 13, 15 (1998). One such instance is when a writ petition offers this court "a unique opportunity to define the precise parameters of [a] privilege" conferred by a statute that this court has never interpreted. Ashokan v. State, Dep't of Ins., 109 Nev. 662, 667, 856 P.2d 244, 247 (1993). We conclude that this writ petition raises an issue of first impression that implicates a matter of public importance: Whether a journalist waives the protection of the news shield statute with respect to the contents of an article that has been published. Accordingly, today we address this petition.

II. Nevada's news shield statute

Nevada's news shield statute is one of the most liberal in the country. See Leslye deRoos Rood and Ann K. Grossman, The Case for a Federal Journalist's Testimonial Shield Statute, 18 Hastings Const. L.Q. 779 (1991) (comparing the protection provided by various state news shield statutes) [hereinafter Testimonial Shield Statute]. The statute confers upon journalists an absolute privilege from disclosure of their sources and information in any proceeding. Specifically, the shield statute provides in pertinent part:
No reporter ... of any newspaper ... may be required to disclose any published or unpublished information obtained or prepared by such person in such person's professional capacity in gathering, receiving or processing information for communication to the public, or the source of any information procured or obtained by such person, in any legal proceedings, trial or investigation:
1. Before any court, grand jury, coroner's inquest, jury or any officer thereof.
NRS 49.275(1).
In 1971, two years after enacting the first shield law, which preceded NRS 49.275, Nevada's legislature enacted NRS 49.385, which governs waiver of privileges by voluntary disclosure. The waiver statute provides:
1. A person upon whom these rules confer a privilege against disclosure of a confidential matter waives the privilege if he or his predecessor while holder of the privilege voluntarily discloses or consents to disclosure of any significant part of the matter.
2. This section does not apply if the disclosure is:
(a) Itself a privileged communication; or
(b) Made to an interpreter employed merely to facilitate communications.
NRS 49.385(1) and (2)(a) and (b).
Questions of statutory interpretation are subject to this court's independent review. See State, Emp. Sec. Dep't v. Holmes, 112 Nev. 275, 283, 914 P.2d 611, 616 (1996). "It is well settled in Nevada that words in a statute should be given their plain meaning unless this violates the spirit of the act." McKay v. Bd. of Supervisors, 102 Nev. 644, 648, 730 P.2d 438, 441 (1986). "`[N]o part of a statute should be rendered nugatory, nor any language turned to mere surplusage, if such consequences can properly be avoided.'" Paramount Ins. v. Rayson & Smitley, 86 Nev. 644, 649, 472 P.2d 530, 533 *55 (1970) (alteration in original) (quoting Torreyson v. Board of Examiners, 7 Nev. 19, 22 (1871)). Thus, "[w]here a statute is clear on its face, a court may not go beyond the language of the statute in determining the legislature's intent." McKay, 102 Nev. at 648, 730 P.2d at 441.
Petitioners contend that Puit waived the shield statute's protection by "identifying his sources and quoting the sources directly in his articles." Petitioners insist that no confidential information is being sought from Puit. Rather, petitioners are allegedly seeking to ascertain whether statements attributed to Trooper Harney in the published news articles were in fact made by him and whether the statements are accurate, since Trooper Harney testified that he cannot recall what he said and deferred to the Puit articles. Petitioners insist that several of the statements in the articles constitute admissions that are directly relevant to the issue of liability against the state and the NHP and that the statements also impeach testimony given by other law enforcement personnel.
Puit points out that Nevada's news shield statute protects both published and unpublished information from disclosure. According to Puit, if publication constitutes waiver of the reporter's privilege, then the word "published," as found in NRS 49.275, would be rendered meaningless. Moreover, Puit maintains that even if the waiver statute could apply to the news shield statute, the "publication of information by a reporter to the public in the course of his professional activities is, itself, a privileged communication[,]" and therefore, an exception to the waiver statute applies. Puit asserts that "[s]ince Nevada's Shield Law applies to `published' `information' `prepared by' a reporter, the law obviously applies to published newspaper articles." The Nevada Press Association agrees with Puit's position.[3] In its amicus curiae brief, it contends that had the legislature intended that the reporter's privilege apply only to unpublished and confidential information, the legislature would have specifically excluded the word "published" from the statute.
This court has previously held that the news shield statute only applies to confidential information and can be waived by voluntary disclosure. Newburn v. Howard Hughes Medical Institute, 95 Nev. 368, 594 P.2d 1146 (1979); accord Las Vegas Sun v. District Court, 104 Nev. 508, 761 P.2d 849 (1988).
In Newburn, we considered whether the news shield statute is waived when a news reporter voluntarily discloses information. There, the news reporter, Newburn, met with representatives of Howard Hughes' estate in April 1978, and answered questions with respect to information he had obtained concerning the existence of Hughes' will. Newburn, 95 Nev. at 370, 594 P.2d at 1147-48. Later, when Newburn appeared for a deposition regarding matters disclosed during the April 1978 meeting, he asserted the reporter's privilege and declined to answer questions. Id., 594 P.2d at 1148. The party taking Newburn's deposition moved for an order to compel discovery. Id. In granting the motion, the district court found that Newburn had waived any claim of privilege by voluntarily disclosing the information at the April 1978 meeting. Id. at 371, 594 P.2d at 1148. Newburn refused to comply with the district court's order and was subsequently found in contempt. Id. at 370, 594 P.2d at 1148.
On appeal, Newburn contended that Nevada's news shield statute was absolute and not subject to waiver under NRS 49.385. Id. at 371, 594 P.2d at 1148. Moreover, Newburn argued that the information he obtained was itself privileged and therefore not subject to the waiver provisions of NRS 49.385 because he was engaged in "investigative reporting" at the time he received it. Id. at 372, 594 P.2d at 1148-49.
In rejecting Newburn's contentions and affirming the district court's order, we first determined that "[a]ll privileges recognized by NRS Chapter 49 are explicitly subject to the waiver provisions of NRS 49.385." Id. at 371, 594 P.2d at 1148. Next, we focused on the confidential character of the information *56 disclosed. Id. at 372, 594 P.2d at 1149. Specifically, this court considered whether the information obtained and disclosed by Newburn was confidential and made the following observation:
The privilege against disclosure of a confidential matter is waived by a voluntary disclosure of any significant part. NRS 49.385(1). If the information disclosed by Newburn during the April 6 interview was not of a confidential character, he has no privilege to assert. On the other hand, if it was of a confidential character, it is evident that he did not consider it to have been received in confidence since he voluntarily disclosed that information and must be deemed to have waived any privilege conferred.
Id. Accordingly, this court concluded that either no privilege existed because the information was not confidential, or that Newburn waived the reporter's privilege by voluntarily disclosing the information related to Howard Hughes' estate. In his dissent, former Justice Gunderson stated that "the majority opinion incorrectly implies that whenever news personnel relate something they have discovered, in or out of print, a waiver results, thereby subjecting such personnel to interrogation upon `related' matters. I am confident our Legislature never intended such a result." Id. at 374, 594 P.2d at 1150.
Nearly a decade after Newburn, this court again addressed the waiver statute as applied to the news shield statute, this time in the libel context in Las Vegas Sun. In Las Vegas Sun, Milton Schwartz brought a defamation suit against Herman and Brian Greenspun and the Las Vegas Sun for a series of editorials which he claimed defamed him. Las Vegas Sun, 104 Nev. at 510, 761 P.2d at 851. While preparing for trial, Schwartz sought discovery of a wide range of materials relating to the editorials. Id. In response, Herman Greenspun cited Nevada's news shield statute as granting him an absolute privilege from disclosure. Id. Schwartz moved the district court for relief, and the district court ordered discovery of all materials relating to people, organizations or documents mentioned in the editorials. Id. The defendants then filed a petition for a writ of prohibition in this court. After considering the matter, we concluded that "the discovery order [was] too broad and intrude[d] upon the statutory privilege granted by the legislature." Id. Consequently, we granted the petition.
In reviewing the news shield statute's legislative history, we determined that the statute was intended to protect journalists from forced disclosure of their confidential sources. Las Vegas Sun, 104 Nev. at 511, 761 P.2d at 851. More specifically, we stated that "[t]he legislative history behind the current shield law illustrates the legislators' concern with protecting confidentiality during and after the news gathering process. The legislature enacted the first shield law in 1969. It protected news media representatives from forced disclosure of their sources." Id. Unfortunately, however, this excursion into legislative history bypassed the plain language of the news shield statute; namely, that journalists, when acting as such, are protected from disclosing any information that is gathered or prepared for public dissemination. As the news shield statute's language is plain and unambiguous, no legislative history analysis was warranted. McKay, 102 Nev. at 648, 730 P.2d at 441.
This court also iterated that "[t]oday we again hold that a waiver under NRS 49.385 applies to the news gatherers' privilege and describe more definite limitations on the breadth of waiver in matters relating to discovery of information held by news media defendants." Las Vegas Sun, 104 Nev. at 513, 761 P.2d at 852. In delineating the scope of the waiver statute, we further stated that publication of a source and the source's statements waives the news shield statute's protection to the extent of the publication:
we conclude that the disclosure of a source and the attribution of remarks to that source is a clear cut waiver of the shield privilege as to that name and those statements. When a newspaper or broadcaster names its source and quotes statements made by that source, the underlying purpose of the shield law is vitiated and the statutory privilege is waived. There is no claim of confidentiality to be made under these circumstances, as conceded by petitioners at the appeal hearing. [Footnote *57 omitted.] Therefore, during the discovery process, news media litigants can properly be required to admit and document the precise matters disclosed in their publications or broadcasts.
Id., 761 P.2d at 852-53 (citations omitted).
The Newburn and Las Vegas Sun decisions suggest that confidentiality is a key consideration in determining whether the statutory news shield privilege has been waived. Both opinions fail, however, to recognize the distinction between privileges relating to confidential communications, and the reporter's privilege, in determining whether the waiver statute applies.
Privileges relating to confidential communications, such as those between attorney and client, between doctor and patient, and between spouses, shield the confidentiality of communications within special relationships and are not designed or intended to assist the fact-finding process or to uphold its integrity. See John W. Strong, McCormick on Evidence, § 72, at 268-69 (4th ed.1992). These privileges are justified by the public's interest in encouraging socially useful communications and by certain notions of legitimate privacy expectations. See generally Developments in the LawPrivileged Communications, 98 Harv.L.Rev. 1450 (1985) (examining the evolution of evidentiary privileges in American law) [hereinafter Privileged Communications]. Accordingly, confidential communications made between persons in certain special relationships are privileged from compelled disclosure. Nevada's legislature has expressly recognized such privileges. See NRS 49.095 (attorney-client privilege); NRS 49.185 (accountant-client privilege); NRS 49.209 (psychologist-patient privilege); NRS 49.225 (doctor-patient privilege); NRS 49.247 (therapist-patient privilege); NRS 49.252 (social worker-client privilege); NRS 49.295 (spousal privilege).[4] Generally, privileges relating to special relationships can be waived by the source of the confidential information, whose identity is usually known. See Carl C. Monk, Evidentiary Privilege for Journalists' Sources: Theory and Statutory Protection, 51 Mo.L.Rev. 1, 49 (1986) (examining the reporter's privilege in state and federal jurisprudence) [hereinafter Evidentiary Privilege].
In contrast, the reporter's privilege does not arise strictly as a result of confidence or a special relationship. This privilege arises when a journalist gathers information within his or her professional capacity for the purpose of dissemination. See NRS 49.275. The policy rationale behind this privilege is to enhance the newsgathering process and to foster the free flow of information encouraged by the First Amendment to the U.S. Constitution. See Evidentiary Privilege at 49. Accordingly, the privilege from compelled disclosure belongs to the journalist, not the source, who may be unidentified.
The Newburn and Las Vegas Sun courts' misdirected focus on confidentiality is understandable, since the news shield statute's history illustrates that the legislature was originally concerned with protecting the confidentiality of reporters' sources. Additionally, the waiver statute expressly provides that the "privilege against disclosure of ... confidential matter[s] " is subject to waiver. NRS 49.385(1) (emphasis added). Notwithstanding, the news shield statute's plain language provides that the privilege against compelled disclosure applies to published as well as unpublished information.
*58 As noted, the waiver statute speaks only to confidential information, the type of information that is pertinent in analyzing privileges related to confidential communications within special relationships. We therefore conclude that the waiver statute was intended, by its plain language, to apply to these types of privileges. The statute's exceptions in subsection 2 underscore our conclusion: the waiver statute does not apply if the disclosure of a confidential matter "is ... [i]tself a privileged communication[ ] or ... [is] [m]ade to an interpreter employed merely to facilitate communications." NRS 49.385(2)(a) and (b). "Privileged communication" is a term of art used to describe "[t]hose statements made by certain persons within a protected relationship ... which the law protects from forced disclosure." Black's Law Dictionary 1198 (6th ed.1990). Thus, a "confidential matter" is not subject to compelled disclosure if it is divulged in the context of another protected relationship. See Cheyenne Construction v. Hozz, 102 Nev. 308, 720 P.2d 1224 (1986) (holding in an action for breach of contract, that where plaintiff's attorney testified as to his dealings with defendant, plaintiff did not waive the privilege to refuse to disclose and prevent others from disclosing confidential communications between plaintiff and his attorney). Similarly, a confidential communication is not rendered discoverable if made through an interpreter. See NRS 49.385(2)(b).
While confidentiality may be one important factor in communications between a journalist and the source of information, confidentiality is not the defining factor in the existence of the reporter's privilege, nor does confidentiality play a role in determining whether a reporter has waived the privilege. The news shield statute protects all information, not just confidential information, which is obtained by a reporter in his or her capacity as a journalist and which is intended for dissemination. If the waiver statute applied to the news shield statute, as the Newburn and Las Vegas Sun courts determined, then by publishing confidential information, a reporter has waived the news shield privilege as to that information. Such a result vitiates the plain language of the news shield statute, which protects published information from compelled disclosure. Accordingly, we conclude that the waiver statute does not apply to the privilege created by the news shield statute. Instead, as discussed above, the waiver statute is limited to those privileges that center on confidential communications.
Our reading of the statutory provisions at issue in this petition is consistent with the public policy rationale behind the news shield statute. Nevada's news shield statute serves an important public interest and provides absolute protection against compelled disclosure to ensure that through the press, the public is able to make informed political, social and economic decisions. See Testimonial Shield Statute at 801.
As our Newburn and Las Vegas Sun opinions applied the waiver statute to the news shield statute, and attempted to define the scope of the news shield statute based on confidentiality, we must overrule Newburn and, in large part, Las Vegas Sun. Newburn's conclusion, that a reporter who voluntary discloses information obtained in the newsgathering process waives any privilege with respect to that information, cannot withstand scrutiny when examined in light of the news shield statute's broad and unambiguous protection of published information.[5] Similarly, Las Vegas Sun is overruled to the extent that it mirrors Newburn's analysis of confidentiality and waiver. Nevertheless, we reaffirm our ruling in Las Vegas Sun as it pertains to actions for libel. In particular, as we stated in that opinion, once a media litigant has invoked the protection of the news *59 shield statute to resist discovery, the defendant may not later rely on the privileged information as a defense.[6]Las Vegas Sun, 104 Nev. at 514, 761 P.2d at 853-54.
We emphasize that our decision today extends protection only to the journalist's newsgathering and dissemination activities within the journalist's professional capacity. Nevada's news shield statute provides no protection for information gathered in other capacities. We further recognize that although the news shield statute provides an absolute privilege to reporters engaged in the newsgathering process, there may be certain situations, e.g., when a defendant's countervailing constitutional rights are at issue, in which the news shield statute might have to yield so that justice may be served.
As a final point, we note that in litigation such as the underlying case, where the story has been widely disseminated, an effort to use the news media to produce evidence beneficial to a litigant is not a function of the news media, and the shield statute protects it from such abuse.

CONCLUSION
Nevada's news shield statute is not limited to confidential sources, but includes any source. The shield statute covers both published and unpublished information, and includes both the information obtained and the source of the information. Thus, Nevada's waiver statute does not apply with respect to the news shield statute. Under Nevada law, a journalist does not waive any rights or privileges by publication.
Accordingly, our intervention by way of extraordinary relief is not warranted, and we deny this petition.[7]
ROSE, C.J., and BECKER, J., concur.[8]
MAUPIN, J., with whom SHEARING and AGOSTI, JJ., agree, concurring.
We agree that the petition for writ of mandamus or prohibition should be denied. Subject to the reservations articulated by the majority opinion that do not apply to this case, the language of NRS 49.275 is plain and comprehensive: "No reporter ... may be required to disclose any published or unpublished information obtained in [a professional capacity] ... in any legal proceedings...." This language clearly applies to the deposition questioning of Glen Puit, the real party in interest in the underlying matter. The district court properly denied the motion to compel.
We also conclude that there are other important reasons why we should not grant extraordinary relief in this matter.[1]
The instant petition is one of three applications for extraordinary relief brought by these petitioners challenging separate orders entered by the district court in the underlying matter. All were lodged within a six-month time frame. One of the petitions involved a clearly valid denial of a motion for partial summary judgment. The second challenged a refusal to disqualify opposing counsel. We denied intervention in both of the other matters. It is only this court's desire to clarify the rights of press representatives under the shield statute that warrants more specific consideration of this third application.[2]
*60 The litigation that is the subject of the instant petition for extraordinary relief arises from a terrible motor vehicle accident involving multiple fatalities. Petitioners are the heirs of the persons killed in that accident. The facts bearing on this application are set forth below.
Responding to a dispatch call shortly after midnight on September 21, 1996, Nevada Highway Patrol Trooper John Kennedy found Michael Estrada outside of his vehicle sitting on the side of a limited access freeway in Clark County, Nevada. Based upon his observations and conversations with Estrada, Trooper Kennedy concluded that Estrada was intoxicated. Not observing Estrada behind the wheel, Trooper Kennedy ordered Estrada's nearby vehicle towed and took Estrada to his place of residence. At his deposition, Kennedy conceded his belief that Estrada was under the influence of alcohol. He also testified that he was the only trooper to respond to the scene where Estrada was located.
About eleven hours following the interaction with Trooper Kennedy, Estrada reclaimed his vehicle from the towing company. Shortly thereafter, Estrada collided with a vehicle occupied by Felipe Diaz, Miguel Alcantara and Eva Alcantara, all of whom were killed. Tests performed after the accident confirmed that Estrada was intoxicated. An expert retained by the petitioners has opined that Estrada's blood alcohol content was about .263% at the time of Trooper Kennedy's encounter with Estrada. Petitioners filed suit for wrongful death damages against the towing company and the Nevada Highway Patrol. The crux of petitioners' lawsuit against the highway patrol is the failure of Trooper Kennedy to take Estrada into protective custody under NRS 458.270.[3]
Following the accident, real party in interest Glenn Puit, a Las Vegas Review Journal news reporter, interviewed Trooper Steve Harney, a Nevada Highway Patrol Public Information Officer, about the accident. Thereafter, Puit wrote a series of articles, which, inter alia, quoted Harney as saying that "troopers" responded to the scene and *61 found that Estrada was "highly" intoxicated. At his deposition, Harney could not clearly recall what he said to Puit with regard to Kennedy's version of his encounter with Estrada and that he, Harney, would defer to Puit as to what was said in the interviews about these particular factual issues.
Petitioners contend that several of Harney's statements in the articles constitute admissions that are directly relevant to the issue of liability against the State and the Nevada Highway Patrol. They primarily contend that these statements "refute" Kennedy's testimony that he was alone and that Michael Estrada was "not intoxicated or, in his opinion, under the influence of any substance, particularly alcohol at the time of their interaction some twelve hours before the accident."[4] They also contend that they have no other means by which to effect this impeachment or corroborate the testimony of their expert on blood alcohol levels. This concern is not, in our view, justified.
First, Harney's purported statement to Puit that "troopers" responded to the original confrontation with Estrada is clearly stated in the articles. Petitioners are entitled to cross-examine Harney about the use of the plural rather than the singular in the article, i.e., whether, in fact, Harney told Puit that "troopers," rather than a "trooper" responded to the scene. The use of the plural in the article and the significance of the possibility that more than one trooper responded to the original confrontation may then be argued by both sides to the ultimate fact finder. It does not, however, seem to the objective observer that Puit's use of the term "troopers" in discussing Harney's version of the highway patrol's first encounter with Estrada creates a clear contradiction of Kennedy's testimony.[5] This does not necessarily mean that petitioners should not pursue the possibility of a contradiction; however, it does not appear that this testimony is the lynchpin of petitioners' liability case against the Nevada Highway Patrol. Certainly, an issue of this magnitude should not be the subject of a claim for extraordinary relief.
Second, petitioners claim that Kennedy must be impeached on the question of Estrada's intoxication is most surprising. Contrary to the portion of the petition quoted above, Kennedy unequivocally conceded his belief that Estrada was drunk at the time of their interaction, twelve hours prior to the actual accident. The fact that Kennedy did not use the term "highly" intoxicated in his testimony does not justify our intervention via extraordinary writ to force a newspaper reporter to testify in violation of the state's "shield law." Also, Kennedy can be cross-examined as to whether Estrada's state of intoxication justified or mandated use of the protective custody provisions of NRS 458.270.[6] Clearly, the evidence given by Trooper Kennedy confirms rather than contradicts petitioners' expert testimony relative to Estrada's blood alcohol levels.[7] Finally, *62 Harney is still subject to cross-examination with regard to the articles and Nevada Highway Patrol policies with regard to such situations.
In Shoen v. Shoen, 48 F.3d 412 (9th Cir. 1995), the United States Court of Appeals for the Ninth Circuit discussed a situation in which it felt forced disclosure of press information might be appropriate within the context of the First Amendment of the U.S. Constitution. The Ninth Circuit concluded that disclosure of press materials should be the exception and not the rule:
[W]here information sought is not confidential, a civil litigant is entitled to requested discovery notwithstanding a valid assertion of the journalist's privilege by a nonparty only upon a showing that the requested material is: (1) unavailable despite exhaustion of all reasonable alternative sources; (2) noncumulative; and (3) clearly relevant to an important issue in the case.
Shoen, 48 F.3d at 416.[8]
In the present case, the evidence sought has only marginal importance in the matter pending in district court. Alternatives available to these petitioners demonstrate that their claimed need for disclosure is far outweighed by the need to protect the press under either the shield statute or the First Amendment to the U.S. Constitution.

CONCLUSION
We therefore conclude that the testimony sought from the real party in interest, Puit, is not so essential to petitioners' lawsuit as to justify a grant of extraordinary relief from this court. Further, the repeated resort by these petitioners to extraordinary remedies serves only to seek our "micro-management" of an ongoing piece of district court litigation. We realize that this case is most important to the petitioners herein. However, the need for extraordinary relief has not been demonstrated in any of their petitions.[9]
SHEARING and AGOSTI, JJ., concur.
NOTES
[1] As this matter is a writ petition filed prior to trial of the underlying case, the record before this court is limited; accordingly, allegations of intoxication remain to be determined in the district court.
[2] With regard to the liability of the state and the NHP, petitioners' strategy at trial appears to include arguing that once Trooper Kennedy determined that Estrada was intoxicated, he was required to place Estrada under civil protective custody instead of driving Estrada home. NRS 458.270(1) provides that, generally, "a person who is found in any public place under the influence of alcohol, in such a condition that he is unable to exercise care for his own health or safety or the health or safety of others, must be placed under civil protective custody by a peace officer."
[3] On April 13, 1999, this court granted the Nevada Press Association's motion for leave to file an amicus curiae brief and directed the clerk of this court to file the brief. See NRAP 29.
[4] Nevada's legislature also recognizes a medical or dental peer-review privilege as set forth in NRS 49.265. Doctrinally and analytically the peer-review privilege raises distinct concerns from the special relationship privileges cited above. Most notably, unlike the special relationship privileges which protect personal privacy interests that generally affect the great majority of society, the peer-review privilege protects the underlying needs of the institution. See Privileged Communications at 1594. Twice this court has addressed the scope of Nevada's peer-review privilege. See Columbia/HCA Healthcare v. Dist. Court, 113 Nev. 521, 936 P.2d 844 (1997) (holding occurrence reports are not exempt from discovery); Ashokan v. State, Dep't of Ins., 109 Nev. 662, 856 P.2d 244 (1993) (holding records acquired without recourse to discovery proceedings are not exempt from discovery). Today, we need not and do not address whether the waiver statute applies to the peer-review privilege.
[5] The Newburn court concluded that the record supported the district court's finding that Newburn was not gathering information for the purpose of dissemination. Newburn, 95 Nev. at 372, 594 P.2d at 1149. Ostensibly, the Newburn court could have determined that since Newburn did not obtain the information regarding Hughes' will with the intent to publish it, that Newburn was exempt from the protection of the shield statute. In overruling Newburn, we do not intend to suggest that any voluntary disclosure of information by a reporter falls within the definition of "published" under the statute, only that the dissemination in this case clearly was protected publication. Whether Newburn's conduct was within the definition of "published" was not adequately discussed in the Newburn decision, and we decline to address the issue today.
[6] Moreover, to the extent that a plaintiff in a defamation action is required to prove that a media litigant either knew that the published information was false or acted in reckless disregard of the truth, an assertion of the shield statute may result in discovery sanctions.
[7] We need not address Puit's first amendment argument. See Director, Dep't Prisons v. Arndt, 98 Nev. 84, 86, 640 P.2d 1318, 1320 (1982) (noting that "[i]t is well settled that this court will not address constitutional issues unless the[y] are requisite to the disposition of a case").
[8] The Honorable Cliff Young, Justice, voluntarily recused himself from participation in the decision of this matter.
[1] This matter was originally submitted to the southern panel of this court for decision without oral argument. I was against intervention at that time for the reasons set forth below in this separate opinion. This would have left in place the protections extended to the real party in interest by the district court.
[2] In one of the separate orders we admonished counsel with regard to these applications. The resources of the court should not be routinely expended on an interlocutory basis to address grievances with orders handed down in the ordinary course of district court litigation. Such matters should be resolved on direct appeal unless the standards for extraordinary relief can be met. None of these applications meet these standards. See, e.g., State ex rel. Dep't Transp. v. Thompson, 99 Nev. 358, 662 P.2d 1338 (1983).
[3] The version of NRS 458.270 in effect as of the date of this accident stated:

1. Except as provided in subsection 7, a person who is found in any public place under the influence of alcohol, in such a condition that he is unable to exercise care for his own health or safety or the health or safety of others, must be placed under civil protective custody by a peace officer.
2. A peace officer may use upon such a person that kind and degree of force which would be lawful if he were effecting an arrest for a misdemeanor with a warrant.
3. If a licensed facility for the treatment of persons who abuse alcohol exists in the community where the person is found, he must be delivered to the facility for observation and care. If no such facility exists in the community, the person so found may be placed in a county or city jail or detention facility for shelter or supervision for his own health and safety until he is no longer under the influence of alcohol. He may not be required against his will to remain in either a licensed facility, jail or detention facility longer than 48 hours.
4. An intoxicated person taken into custody by a peace officer for a public offense must immediately be taken to a secure detoxification unit or other appropriate medical facility if his condition appears to require emergency medical treatment. Upon release from the detoxification unit or medical facility, the person must immediately be remanded to the custody of the apprehending peace officer and the criminal proceedings proceed as prescribed by law.
5. The placement of a person found under the influence of alcohol in civil protective custody must be:
(a) Recorded at the facility, jail or detention facility to which he is delivered; and
(b) Communicated at the earliest practical time to his family or next of kin if they can be located and to the division or to a local alcohol abuse authority designated by the division.
6. Every peace officer and other public employee or agency acting pursuant to this section is performing a discretionary function or duty.
7. The provisions of this section do not apply to any driver apprehended or arrested for the offense of operating a vehicle under the influence of intoxicating liquor or controlled substances, pursuant to Chapter 484 of NRS.
(Emphasis added.) Whether these provisions create a legal duty to third parties is not now before us.
[4] This quotation is taken from the instant petition and petitioners' formal written "Objection to Discovery Commissioner's Report and Recommendations" filed in district court.

The petition includes quotations from Harney's deposition wherein he denies the accuracy of Puit's article stating that Estrada had been questioned by state "troopers" for suspicion of drunk driving. Harney explained the inaccuracy by stating that the official response was to a person sitting outside of a stopped vehicle. In any case, the questions posed by Trooper Kennedy to Estrada would certainly qualify as inquiries in connection with possible drunk driving. Thus, petitioners do not cite this conflict as creating a need for extraordinary relief in this case.
[5] Harney testified at his deposition that his use of the term "troopers," rather than "trooper," was generic, i.e., that he always referred to NHP trooper responses in terms of "troopers," even when only one officer was involved.
[6] See comments in note 3.
[7] Petitioners contend below that the impeachment of Kennedy is important to corroborate their toxicology expert. Again, Kennedy took Estrada home because he was intoxicated. In any event, the circumstances of Kennedy's encounter with Estrada leaves little doubt of the advanced state of Estrada's intoxication.

In this connection, petitioners alleged in the district court and allege here that "it was later determined" that Estrada's blood alcohol level at the time of the encounter with Trooper Kennedy was .263%. Without commenting on the validity of this finding by petitioners' expert, and certainly conceding Trooper Kennedy's agreement that Estrada was intoxicated, it seems somewhat excessive to blithely state that a person's blood alcohol level some twelve hours before testing has been "determined." We raise this point only to underscore what appears to be a tendency by petitioners' counsel to overstate propositions urged to us.
[8] The Nevada shield statute provides greater protection to the press than that provided under the First Amendment to the U.S. Constitution. Thus, it is unnecessary to resolve this matter on constitutional grounds. However, an analysis of the First Amendment balancing test relied upon in Shoen underscores our reasons for denying extraordinary relief.
[9] We also note that petitioners sought sanctions in district court against the real party in interest's counsel in connection with his position that the shield statute protected him from having to testify in the matter below. The repeated petitions for extraordinary relief, a spurious request for sanctions and what we perceive to be a chronic tendency to overstate their positions seems to suggest that this is all part of an overly aggressive litigation strategy. We can only express our hope that petitioners' counsel will reconsider his approach to the prosecution of this case.